**Helene EICHENWALD, et al., Plaintiffs,**

v.

**KRIGEL'S, INC., et al., Defendants.**

**No. 94–2292–JWL.**

United States District Court,
D. Kansas.

Oct. 12, 1995.

Memorandum Granting Limited
Reconsideration Dec. 13, 1995.

---

Jeanne Gorman Rau, Deryl W. Wynn, Daniel B. Denk, McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, for plaintiffs.

Leonard Singer, Sharon D. Hess, Bioff, Singer & Finucane, Michael J. Belfonte, Sanford P. Krigel, Karen E. O'Connell, Krigel & Krigel, P.C., Kansas City, MO, for defendants.

### MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

### I. Introduction

A trial to the court was held from September 5, 1995 through September 8, 1995, in this sexual harassment action brought under

**1538**

the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e *et seq.* The plaintiffs, Helene Eichenwald ("Ms. Eichenwald"), Marla Richman ("Ms. Richman"), Leanne Fuller (formerly Alexander) ("Ms. Fuller") and Thomas Harrison[1] ("Mr. Harrison"), claim that they were subjected to an unlawful hostile work environment (and that Ms. Eichenwald was subjected to "quid pro quo" sexual harassment) which led to the constructive discharge of Ms. Eichenwald, Ms. Richman, and Ms. Fuller and that Mr. Harrison was discharged in retaliation for complaining about unlawful discriminatory conduct. The plaintiffs contend that they were sexually harassed by supervisory employees of the defendants, Robert Shine[2], James Gross[3], Gary Stein[4], and Robert Ward[5], while working at Krigel's of Metcalf South, Inc., Krigel's of Mission Center, Inc., Krigel's of Oak Park, Inc., and Krigel's of Bannister Mall, Inc. The plaintiffs further allege that Krigel's, Inc., the parent and sole shareholder of Krigel's of Metcalf South, Inc., Krigel's of Mission Center, Inc., Krigel's of Oak Park, Inc., and Krigel's of Bannister Mall, Inc., and these subsidiary corporations should be treated as a single employer for purposes of plaintiffs' Title VII claim under an integrated enterprise theory.

The court has carefully reviewed the submissions of the parties and has thoroughly considered the evidence and arguments presented at trial. It has relied to a considerable degree on its opportunity to form conclusions about the credibility of the witnesses from close observation of their demeanor while testifying at trial. This is not a pleasant case. It is clear that Mr. Shine engaged in appalling and abusive behavior which was sexually harassing, pervasive and unwelcome as to the plaintiffs Eichenwald, Richman and

Fuller and which was so intolerable that it led to their leaving jobs with the defendants. Moreover, the evidence is abundantly clear both that the defendants meet the integrated enterprise test and that Mr. Shine's conduct is attributable to them. Thus, the court finds for these plaintiffs and against the defendants. On the other hand, the court does not find the testimony of Mr. Harrison credible concerning the unwelcomeness of Mr. Shine's behavior and finds that there is also no persuasive evidence that Mr. Harrison was retaliated against for opposing sexual harassment. His unsupported claims totally lack merit. As a result, the court finds against Mr. Harrison.

On the subject of remedy[6], the court was not persuaded by the evidence presented at trial that the three prevailing plaintiffs are entitled to recover the sums demanded. In fact, these plaintiffs presented very little evidence from which the court could determine what they probably would have earned under Krigel's pay plan and its largely commission based compensation scheme. Thus, based on the evidence which was presented, the court's award of back pay to Ms. Eichenwald is in the amount of $22,558.24; to Ms. Richman is in the amount of $4,895.32; and to Ms. Fuller is in the amount of $3,956.01.

## II. Sexual Harassment, Constructive Discharge & Retaliation

### A. Sexual Harassment

Two principal theories of sexual harassment may be shown under Title VII: quid pro quo discrimination and hostile work environment. *Martin v. Nannie and the Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir. 1993) (citing *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49

---

1. Wendy Gilbert dismissed with prejudice her cause of action against the defendants on the first day of the trial.

2. Mr. Shine was vice president of operations for the defendants during the time of his alleged misconduct.

3. Mr. Gross was the manager of a Krigel's jewelry store when he allegedly harassed Ms. Eichenwald while she was working at Krigel's corporate headquarters.

4. Mr. Stein was the manager of Krigel's of Bannister Mall, Inc. in 1988 when he allegedly harassed Ms. Eichenwald.

5. Mr. Robert Ward became vice president of operations of the defendants in September of 1991, after Mr. Shine was terminated.

6. Because the discrimination complained of in this case occurred before December 1, 1991, the only remedy sought by plaintiffs is back pay.

(1986)). Plaintiffs Fuller, Richman, and Harrison's claims are based only on the latter theory. Plaintiff Eichenwald's claim is based on both theories.

■ To make a prima facie case of hostile work environment under Title VII, a plaintiff must show that: (1) he or she is a member of a protected group; (2) the conduct in question was unwelcome; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive to create an abusive working environment; and (5) that some basis exists for imputing liability to the employer. *Schindler v. Larry's IGA, Inc.,* No. 92–1033–PFK, 1994 WL 324563, at *2 (D.Kan. June 16, 1994) (citing *Ebert v. Lamar Truck Plaza,* 715 F.Supp. 1496, 1498 (D.Colo.1987), *aff'd,* 878 F.2d 338 (10th Cir. 1989)); *Ball v. City of Cheyenne,* 845 F.Supp. 803, 809 (D.Wyo.1993) (citing *Paroline v. Unisys Corp.,* 879 F.2d 100, 105 (4th Cir.1989)).

■ To prevail under a hostile work environment theory, a plaintiff must show that sexual conduct had the "purpose or effect of unreasonably interfering" with his or her work performance or created an "intimidating, hostile, or offensive working environment." *Martin,* 3 F.3d at 1414. Sexual harassment is actionable where the "workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' ... that is 'sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment'." *Harris v. Forklift Systems, Inc.,* — U.S. —, —, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). Casual or isolated manifestations of a discriminatory environment are not sufficient to demonstrate a hostile working environment under the law. *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1414 (10th Cir.1987). "Whether the sexual conduct complained of is sufficiently pervasive to create a hostile or offensive work environment must be determined from the totality of the circumstances." *Sauers v. Salt Lake County,* 1 F.3d 1122, 1126 (10th Cir.1993). These may include:

> ... the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Harris,* — U.S. at —, 114 S.Ct. at 371. These factors are evaluated from both a subjective and an objective viewpoint. The court must consider not only the effect the discriminatory conduct actually had on the plaintiff, but also the impact it likely would have had on a reasonable employee in the plaintiff's position.[7] *Id.* at —, 114 S.Ct. at 370. Evidence of a general work atmosphere, in addition to evidence of specific hostility directed at the plaintiff, may be considered in evaluating the claim. *Daemi v. Church's Fried Chicken, Inc.,* 931 F.2d 1379, 1385 (10th Cir.1991). Relatively isolated instances of non-severe misconduct will not support a hostile work environment claim. *Saxton v. American Tel. & Tel. Co.,* 10 F.3d 526, 533 (7th Cir.1993). However, misconduct that is relatively less severe may become actionable, especially when the alleged misconduct is that of a supervisor, when it is so frequent and pervasive that it affects an employee's work environment. *Schweitzer–Reschke v. Avnet, Inc.,* 874 F.Supp. 1187, 1193 (D.Kan.1995).

■ The fact that the sex-related conduct was "voluntary", in the sense that the complainant was not forced to participate against his or her will, is not a defense to a sexual harassment suit brought under Title VII. *Meritor Sav. Bank v. Vinson,* 477 U.S. 57, 68, 106 S.Ct. 2399, 2406, 91 L.Ed.2d 49

---

7. Although the conduct must be sufficiently severe or pervasive, the plaintiff need not prove that she was psychologically injured:

> Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing their own careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their ... gender ... offends Title VII's broad rule of workplace equality.

*Harris,* — U.S. at — – —, 114 S.Ct. at 370–71.

(1986). The gravamen of any sexual harassment claim is that the alleged sexual advances were "unwelcome." *Id.*

 Quid pro quo sexual harassment is anchored in an employer's sexually discriminatory behavior which compels an employee to elect between acceding to sexual demands and forfeiting job benefits, continued employment or promotion, or otherwise suffering tangible job detriment. *Ridge v. HCA Health Services of Kansas, Inc.,* No. 91–1280–PFK, 1992 WL 363686, at *3 (D.Kan. Nov. 3, 1992) (citing *Henson v. City of Dundee,* 682 F.2d 897, 908 (11th Cir.1982)). To prevail under a quid pro quo theory, a plaintiff must show that (1) a supervisor with authority to materially affect the terms and conditions of the plaintiff's employment, (2) subjected the plaintiff to a demand for sexual favors, and (3) the rejection of which resulted in a tangible job detriment. *Starrett v. Wadley,* 876 F.2d 808, 820 (10th Cir.1989); *Sauers v. Salt Lake County,* 1 F.3d 1122, 1127 (10th Cir.1993). If the plaintiff can show that he or she suffered an economic injury from his or her supervisor's actions, the employer becomes strictly liable without any further showing of why the employer should be responsible for the supervisor's conduct. *Id.*

### B. Constructive Discharge

 Plaintiffs Eichenwald, Fuller, and Richman contend that the hostile environment to which they were subjected forced them to leave Krigel's and led to their constructive discharge. An employee who is not formally discharged from employment may still be constructively discharged if the employee was forced to quit due to gender-based intolerable working conditions. *Derr v. Gulf Oil Corp.,* 796 F.2d 340 (10th Cir. 1986). In order to establish a claim of constructive discharge under Title VII, a plaintiff must show that the defendant's conduct produced working conditions that a reasonable person would view as intolerable. *Daemi,* 931 F.2d at 1386. The intolerable conditions must be the result of the employer's illegal discriminatory acts, *Derr,* 796 F.2d at 344, and the plaintiff must show a causal connection between her leaving and the em-

ployer's Title VII violation. *Wolf v. Burum,* No. 88–1233–C, 1990 WL 81219, at *9 (D.Kan. May 16, 1990).

### C. Retaliation

 Title VII prohibits an employer from discriminating against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." *Schindler v. Larry's IGA, Inc.,* No. 92–1033–PFK, 1994 WL 324563 at *9 (D.Kan. June 16, 1994) (quoting 42 U.S.C. 2000e–3(a)). Mr. Harrison contends he was discharged in retaliation for complaining about unlawful discriminatory conduct. To establish a prima facie case of retaliation under Title VII, the plaintiff must show (1) the employee engaged in protected opposition to statutorily prohibited discrimination or participated in a statutorily protected proceeding, (2) the employer took adverse action contemporaneously or subsequent to the employee's protected activity, and (3) a causal connection exists between the protected activity and the adverse employment action. *Meredith v. Beech Aircraft Corp.,* 18 F.3d 890, 896 (10th Cir.1994).

### III. Integrated Enterprise Theory

The Tenth circuit has recognized four different tests for determining whether a parent corporation is liable for the acts of its subsidiary. *Spicer v. Arbor Nall Nursery, Inc.,* Civ.A. No. 93–2537–EEO, 1995 WL 42660, at *3 (D.Kan. Jan. 18, 1995). The four tests are: (1) agency test; (2) alter ego test; (3) instrumentality test; and (4) integrated enterprise test. *Id.* The Tenth Circuit has declined to adopt any one as the exclusive test for use in all employment discrimination cases. *See Frank v. U.S. West, Inc.,* 3 F.3d 1357, 1362 (10th Cir.1993).

 The integrated enterprise test was adopted by the National Labor Relations Board as a self-imposed jurisdictional restriction on the definition of "employer" under Title VII. *See NLRB v. Welcome–American*

*Fertilizer Co.*, 443 F.2d 19 (9th Cir.1971). The integrated enterprise test prevents the court from imposing liability on a parent corporation when, in fact, the parent corporation and its subsidiary are operating independently. *See id.* In *Evans v. McDonald's Corp.*, 936 F.2d 1087, 1089 (10th Cir.1991), the Tenth circuit applied the integrated enterprise test to define "employer" in a Title VII case. In the *Evans* and *Frank* decisions, both the plaintiff and the defendant conceded that the integrated enterprise test best applied to the facts. In the instant case, the defendants do not challenge the plaintiffs' reliance upon the integrated enterprise test. The court will, therefore, apply it to the facts of this case.

 Under this test the court must weigh four factors to determine whether sufficient integration exists to treat the parent corporation and the subsidiary as a single, integrated "employer." *Radio & T.V. Local 1264 v. Broadcast Serv., Inc.*, 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1962); *U.S. West*, 3 F.3d at 1362. The factors are (1) interrelation of operations [8], (2) common management, (3) centralized control of labor relations [9], and (4) common ownership or financial control. *U.S. West*, 3 F.3d at 1362.

The first three factors are weighed more heavily than the last. *Welcome–American Fertilizer*, 443 F.2d at 21. The plaintiff must establish that the defendant Krigel's, Inc.'s control over its stores exceeded that normally exercised by a parent corporation. *U.S. West*, 3 F.3d at 1362.

### IV. Plaintiff's Evidence

#### A. Ms. Eichenwald

Ms. Eichenwald alleges that she was sexually harassed by Mr. Stein [10], Mr. Shine, and Mr. Gross while she was an employee of one of the defendants and while her harassers held supervisory power over her. Ms. Eichenwald offered the following testimony in support of her claim. Ms. Eichenwald was interviewed at defendant Krigel's, Inc. by Scott Krigel and then by Mr. Stein at defendant Krigel's of Bannister Mall, Inc. Scott Krigel [11] told her at her interview that she should go to her store manager, not him, with any problems [12]. Before and while Ms. Eichenwald was employed at Krigel's she was never given an employee handbook and was never informed that Krigel's had a sexual harassment or an "open door" policy.

8. The NLRB has identified seven indicia of interrelatedness: (1) combined accounting records; (2) combined bank accounts; (3) combined lines of credit; (4) combined payroll preparation; (5) combined switchboards; (6) combined telephone numbers; and (7) combined offices. *See Western Union Corp. v. United Telegraph Workers*, 224 NLRB 274, 277, 1976 WL 7018 (1976), aff'd, 571 F.2d 665 (D.C.Cir.1978).

9. Centralized control of labor practices is not only the most critical factor in the four factor analysis, but it is necessary for the two corporate entities to be treated as one. *E.g., Carter v. Shop Rite Foods, Inc.*, 470 F.Supp. 1150 (N.D.Tex. 1979); *see also U.S. West*, 3 F.3d at 1363 (citations omitted); *Fike v. Gold Kist, Inc.*, 514 F.Supp. 722, 727 (N.D.Ala.1981). To establish centralized control, the parent corporation's control of the day-to-day employment decisions of the subsidiary must be shown. *U.S. West*, 3 F.3d at 1363. Day-to-day control must actually be exercised; potential control is not sufficient. *Id.* Courts have found centralized control when the parent was involved in the subsidiary's hiring decisions, *Gold Kist*, 514 F.Supp. at 727; when a common officer had approved all hiring decisions of the subsidiary, *Armbruster v. Quinn*, 711 F.2d 1332 (6th Cir.1983); and when the parent

had issued personnel policies and also fired at least one subsidiary employee, *Smith v. Jones Warehouse, Inc.*, 590 F.Supp. 1206 (N.D.Ill. 1984). The Tenth Circuit has emphasized the importance of a plaintiff's actual experience as an employee with respect to whether the parent corporation hired the plaintiff, fired the plaintiff, or supervised the plaintiff's work on a regular, daily basis. *U.S. West*, 3 F.3d at 1363.

10. The plaintiffs are offering Mr. Stein's alleged 1987–88 conduct only to show that Krigel's management had knowledge of the sexual harassment occurring in their stores and to show a pattern of sexual harassment because the statute of limitations on his 1987–88 conduct ran before plaintiff's brought suit.

11. Scott Krigel was an officer of all the defendants when he interviewed Ms. Eichenwald and is currently the president of all of the defendants.

12. Ms. Eichenwald believes that Scott Krigel told her to go to her store manager with any problems because of their pre-existing personal relationship. She baby-sat for his children for many years. She believes that Scott Krigel did not want anyone to think she was getting special treatment.

Ms. Eichenwald was hired as a part-time sales associate at defendant Krigel's of Bannister Mall, Inc. on or about July 2, 1987 and continued to work there part-time until around July 30, 1988. Mr. Stein was the manager of defendant Krigel's of Bannister Mall, Inc. while Ms. Eichenwald was employed there. Ms. Eichenwald stated that Mr. Stein solicited sex from her, made numerous lewd sexual remarks to her concerning her breasts, her sexual habits[13], and usage of the birth control pill, physically touched her in a sexual manner, and demanded that she talk to other employees about their sex lives and report back to him. Mr. Stein's conduct was so constant and intimidating that she could not concentrate.

Ms. Eichenwald further testified that Mr. Stein conditioned her pay raise on her arranging a date for Mr. Stein with her friend. Mr. Stein also conditioned her request for a Saturday off on her going to Las Vegas with him. When Ms. Eichenwald refused his demand, Mr. Stein said that he would assume that she quit if she did not show up on Saturday. Ms. Eichenwald took the Saturday off and never returned to work. She alleges that she was terminated because she refused to accept Mr. Stein's Las Vegas proposition.

Ms. Eichenwald mentioned Mr. Stein's conduct to Susan Krigel, the wife of Scott Krigel.[14] Susan Krigel reacted casually to Mr. Stein's conduct. To Ms. Eichenwald's knowledge, Krigel's never took any disciplinary action against Mr. Stein.

On October 31, 1990, Ms. Eichenwald was rehired by Scott Krigel as a full-time sales associate at defendant Krigel's of Mission Center, Inc. Her new supervisor, Robert Shine, made lewd, sexual remarks directed to her concerning her sexual habits and her attire, asking her to model lingerie for him, and suggesting that she would sell more if she dressed in a more provocative manner.

On or about January 1, 1991, Ms. Eichenwald was transferred to defendant Krigel's of Bannister Mall, Inc. by Mr. Shine. Ms. Eichenwald told Scott Krigel that she did not want to work with Mr. Stein again. Scott Krigel admitted knowing about Mr. Stein's 1988 conduct. He told Ms. Eichenwald that Mr. Stein was still employed at the Bannister store, but was no longer in a supervisory position. Ms. Eichenwald agreed to work at the Bannister store because she could tolerate working with Mr. Stein as long as he was not in a supervisory position.

On January 27, 1991, Ms. Eichenwald was transferred to the corporate headquarters of Krigel's to work with Scott Krigel on a special marketing project. While working there, James Gross sexually harassed her in person and over the phone. Mr. Gross made several lewd sexual statements to her, did a sexually explicit "Vinny" routine, and told her that Mr. Shine said she was a "player." The term "player", according to Ms. Eichenwald, means someone who is willing to play along with Mr. Shine's sexual harassment. Mr. Shine also sexually harassed her while she was working at Krigel's corporate headquarters. Mr. Shine made comments to Ms. Eichenwald about having sex with her and other employees. He crumpled up a letter from a female customer complaining about a Krigel's salesman sexually harassing her. Mr. Shine told her that he was the salesman the female customer was referring to and, as he crumpled up the letter, that this is what happens when women complain about him. Ms. Eichenwald testified that she did not report Mr. Shine's or Mr. Gross' conduct to Scott, Susan, Peggy, or Richard Krigel because she was afraid of the wrath of Mr. Gross and Mr. Shine.

On or about May 28, 1991, Ms. Eichenwald was transferred back to the Bannister store where she held a sales associate position. When Mr. Shine was at the Bannister store,

---

13. Mr. Stein asked Ms. Eichenwald what sexual position she preferred. When she did not respond, Mr. Stein stated that she likes the bottom because she is a Jewish American Princess and thus likes the man to do all the work.

14. At the time of this conversation, Susan Krigel did not hold a management position at Krigel's,

Inc. This conversation allegedly occurred in Susan Krigel's kitchen. However, Scott Krigel's subsequent indication that he was aware that Ms. Eichenwald did not want to work for Mr. Stein is indicative that Susan Krigel shared this story with him, thereby giving Scott Krigel actual notice of the alleged harassment by Stein.

which was more than once a week, he sexually harassed her.[15] She complained to Gary Pener, the manager of the Bannister store, about Mr. Shine's conduct.

Ms. Eichenwald testified that Mr. Shine asked if he could give her home phone number to his rich customer whom she had helped on one occasion. When she refused, Mr. Shine informed her that she was being transferred to the Independence Center store. Ms. Eichenwald alleges that this transfer was a demotion because the Independence Center store is farther from her house and because it had a lower volume of sales which means less potential for commissions. She also alleges that she was transferred by Mr. Shine to the Independence Center store because she refused to let Mr. Shine give her home number to his rich customer. She believes Mr. Shine was retaliating against her because Gary Pener, her store manager at the Bannister store, was unaware that she had been transferred. Ms. Eichenwald was so upset about the transfer that she could not leave her residence for four days. She could not contact Scott Krigel during those four days because he was out of town at the time.

Ms. Eichenwald went to the Independence Center store for one day and decided to quit instead of accepting Mr. Shine's transfer/demotion. When she did reach Scott Krigel, he told her that he knew the whole story and that there was nothing else to talk about. Ms. Eichenwald filed a charge of sexual harassment with the Equal Employment Opportunity Commission ("EEOC") in January of 1992.

Four weeks after leaving the Independence Center store, Ms. Eichenwald took a job at Marketing Resources and continued to work there until November of 1992 when she was laid off due to a merger.[16] In December of 1992, she was employed at the rate of $10.00 per hour by The Lancaster Group. From March 1, 1993 to March 27, 1993, she worked for Ms. Diane Graham as a nanny.[17] In November of 1993, she worked for Sportswon, Inc. for two and one half weeks.[18] In January of 1994, she took a sales job with Saks Fifth Avenue.[19] On July 10, 1995, she took a job with National Cable Network and is presently employed there.[20] She testified that she has been a successful salesperson at all of her subsequent sales positions and believes that she would have been a successful jewelry salesperson had she not been sexually harassed and constructively discharged.

### B. Ms. Richman

Ms. Richman alleges that she was sexually harassed by Mr. Shine while she was an employee of one of the defendants and Mr. Shine held supervisory power over her. Ms. Richman offered the following testimony in support of her claim. Ms. Richman was interviewed at defendant Krigel's, Inc. by Karen Green[21] and then by Mr. Shine at defendant Krigel's of Mission Center, Inc. at the beginning of April in 1991. Mr. Shine told her that he was vice president of operations and she understood him to mean that he oversaw all of the Krigel's stores. During her interview, Mr. Shine commented that she did not have to hold her dress together because he liked her legs.[22] At the end of her interview, Mr. Shine informed Ms. Richman that she was hired as a full-time office associ-

---

15. For example, Mr. Shine saw a tall woman walk by the Bannister store and commented to Ms. Eichenwald that he would like to have the tall woman wrap her legs around him. This is typical of the comments Mr. Shine repeatedly made.

16. She made $16,000 per year.

17. She made $12.50 per hour plus overtime.

18. She made $100 per day plus commissions.

19. She made $11 per hour plus commissions and bonuses until July 1, 1994, when she was given a raise to $13 per hour plus commissions and bonuses.

20. From 8/10/95 to 8/17/95 she made $50 a sale. She now makes $500 per week plus $50 a sale. She is not likely to make many sales in her present position because it is not a sales position.

21. Karen Green has been the vice president of merchandising since the middle of 1991.

22. Ms. Richman's dress was more revealing because she had lost a button.

ate and that she would be working at the Bannister store. Before and while Ms. Richman was employed at Krigel's she was never given an employee handbook and was never informed that Krigel's had a sexual harassment or an "open door" policy. Ms. Richman began working at the Bannister store on or about April 5. When Mr. Shine was at the Bannister store, he made unwelcome sexual comments and sexual advances toward her.

On or around May 28, 1991, Ms. Richman was transferred to the Metcalf store and was promoted to a full-time sales position. She accepted this transfer and promotion even though she knew she would have to spend more time around Mr. Shine [23] because it had a greater earning potential. While working at the Metcalf store, Ms. Richman saw Mr. Shine more and, as a result, was sexually harassed by him more. Mr. Shine constantly made sexual comments to her about her attire [24], about other women's attire, asked about her sex life [25], asked whether she would keep her mouth shut if they had an affair, looked at her in a sexual manner, rubbed himself against her in a sexual manner [26], and referred to her as a "player." Ms. Richman believes a "player" is someone who plays along with Mr. Shine's sexual harassment.

Ms. Richman stated that she never encouraged Mr. Shine's conduct and that she was afraid to complain about his conduct because she perceived him as having power over her employment and because she believed he would find out about her complaint and retaliate. Ms. Richman could not afford to lose her job at Krigel's because it was her sole income and because she was living paycheck to paycheck. As a result of Mr. Shine's conduct and perceived power, Ms. Richman's job performance was adversely affected because she was nervous and jumpy whenever Mr. Shine was around, which was quite often.

On or about July 9, 1991, Ms. Richman was transferred back to the Bannister store and demoted to an office position. She believes that her transfer/demotion was Mr. Shine's way of punishing her for not being a "player." Mr. Shine continued to harass her while she worked at the Bannister store. As a result of Mr. Shine's constant harassment, Ms. Richman gave two weeks' notice to Krigel's on August 26, 1991, and began looking for other employment. On September 13, 1991, she heard that Mr. Shine was terminated. On September 14, 1991, her last day at Krigel's, Scott Krigel called her at the Bannister store and informed her that Mr. Shine had been terminated and asked her what sexual statements Mr. Shine made to her. Because the store was busy, Ms. Richman only told Scott Krigel the basics of Mr. Shine's conduct. After leaving Krigel's, she filed a charge of sexual harassment with the EEOC in January of 1992.

Immediately after leaving Krigel's, Ms. Richman went to work for Express as a co-manager of a store.[27] Between November of 1991 until the beginning of 1993, Ms. Richman was transferred to various sales and manager positions within the Express family of stores and worked as a salesperson for Danka Business Systems.[28] Around the end of 1992, she began working several part time jobs.[29] Around April of 1994, she moved to

---

**23.** Ms. Richman stated that Mr. Shine spent most of his time at the Metcalf store. Other witnesses testified that they heard Mr. Shine refer to Metcalf as "his" store.

**24.** Mr. Shine told her that she looked "hot" in certain outfits and that she would sell more if she wore sexier clothes.

**25.** Mr. Shine wanted to know what sexual positions she liked and whether she liked sex.

**26.** Mr. Shine would deliberately walk behind the counter, a very tight area, so he could rub up against Ms. Richman.

**27.** She made between $17,500 and $19,500 per year as a co-manager at Express.

**28.** From November of 1991 to April of 1992, Ms. Richman worked at Bath & Body Works as a co-manager and made between $17,500 and $19,500. In April of 1992, she went to work for Danka Business Systems where she made $1,000 to $1,100 per month plus $300-$500 per month in commissions. In November of 1992, she went back to work for Structure as a salesperson and made $5.00 per hour.

**29.** Ms. Richman worked for the Lancaster Group USA from November of 1992 to March of 1993 and made $10 to $13 per hour. She worked for Leawood South Country Club from November of 1992 to December of 1993 and made $8.50 per hour. She worked for T.G.I. Fridays from November of 1993 to March of 1994 and made

Wichita and began working full time for Structure as a co-manager of the store.[30] Around November of 1994, she moved to Topeka with her fiance and began waiting tables at Applebee's.[31] Around April of 1995, she began working full time for Enterprise Car Rental.[32] Ms. Richman testified that she has been a successful salesperson at all of her subsequent sales positions and that she believes that she would have been a successful jewelry salesperson had she not been sexually harassed and constructively discharged and been given more time to prove herself.

### C. Mr. Harrison

Mr. Harrison alleges that he was sexually harassed by Mr. Shine and Mr. Ward while he was an employee of one of the defendants and his harassers held supervisory power over him. Mr. Harrison offered the following testimony in support of his claim. Mr. Harrison was interviewed by Mr. Shine at Krigel's, Inc. around January 14, 1991. Mr. Shine mentioned that Krigel's was expanding soon and that Mr. Harrison would have the opportunity to manage a store in three months. When he returned home Mr. Shine had already left a message on his answering machine offering him a sales position. Mr. Harrison rejected that offer and made a counteroffer which was accepted by Mr. Shine. Before and while Mr. Harrison was employed at Krigel's he was never given an employee handbook and was never informed that Krigel's had a sexual harassment or an "open door" policy.[33]

Mr. Shine informed Mr. Harrison that he was sending him to the Metcalf store. On March 24, 1991, Mr. Harrison was transferred to the Oak Park store and promoted to sales manager. On May 28, 1991, Mr. Harrison was transferred to the Bannister store and was demoted to sales associate. On September 1, 1991, Mr. Harrison was transferred back to the Metcalf store and was promoted to assistant store manager.

Mr. Harrison testified that while he worked for Krigel's, Mr. Shine constantly made rude, crude, bigoted, and sexual comments directed toward himself, his co-workers, and customers and that he saw Mr. Shine deliberately rub up against female employees in a sexual manner.[34] He further testified that Mr. Shine had a violent temper and would often violently blow up at the Metcalf store. Both Wendy Gilbert, a co-worker, and Ms. Fuller complained to Mr. Harrison about being sexually harassed by Mr. Shine.[35]

Mr. Harrison left the Metcalf store when he discovered that Mr. Shine was stealing his commissions. Richard Krigel, Scott Krigel's father and then an officer of the company, called Mr. Harrison and asked him why he left. After Richard Krigel heard Mr. Harrison's version of what transpired, he asked him to meet with Mr. Ward. Before Mr. Harrison met with Mr. Ward, he complained to his store manager, Gary Pener, about Mr. Shine's conduct toward Ms. Fuller and Ms.

---

$2.13 per hour plus approximately $1,000 per month in tips. She worked for GPS, a temporary agency, from September of 1992 until the summer of 1993 and made $7.00 to $7.50 per hour.

**30.** She made between $17,500 and $19,500.

**31.** She made $2.13 per hour plus approximately $1,000 per month in tips.

**32.** From April 21, 1995 to July 20, 1995, Ms. Richman made $537.50 every two weeks plus overtime. She was given a raise effective as of July 21, 1995. She now makes $612.50 every two weeks plus overtime.

**33.** Mr. Harrison testified that he remembered seeing something taped to the side of a store safe

having to do with sexual harassment. He also testified that the stores kept the home numbers of the corporate officers posted in case a sales person needed permission for a price reduction during the evening hours.

**34.** Mr. Shine made comments to Mr. Harrison like: How would you like to fuck Ms. Eichenwald's tits, would Ms. Richman shut up if you stuck your dick in her mouth, help convince Ms. Fuller to have sex with me, and you are a "player.". Mr. Shine also wanted to know about his sexual relations with other employees like Ms. Gilbert.

**35.** Ms. Fuller called Mr. Harrison the day after the "key" incident. Ms. Fuller told him that she bit Mr. Shine's lip when he tried to kiss her in the back room of the Metcalf store after her key broke off in the lock.

Gilbert. Mr. Harrison met with Mr. Ward and described the facts surrounding Mr. Shine's sexual harassment and theft. Scott Krigel contacted Mr. Harrison after his meeting with Mr. Ward and informed him that Mr. Shine had been terminated and asked him to return to work on the condition that he not discuss the Shine incident, to which he agreed.

Subsequent to his return to Krigel's, Mr. Ward, who was now the vice president of operations, asked Mr. Harrison whether he was having sexual relations with his co-workers and accused him of discussing the Shine incident. At the beginning of December of 1991, Mr. Harrison gave notice of his resignation and stated he was going to work through the Christmas season. On December 9, 1991, Scott Krigel and Ed Clancy accepted his resignation early.

While at Krigel's, Mr. Harrison was consistently one of the top ten salespersons. Mr. Harrison testified that he never encouraged Mr. Shine's conduct and attempted to ignore him whenever Mr. Shine's comments were sexual in nature. He filed a charge of sexual harassment and retaliation with the EEOC in January of 1992.

After leaving Krigel's, Mr. Harrison was unable to find employment until July of 1995, when he was hired for a non-sales position at Mr. Tux, a tuxedo rental store.[36] Mr. Harrison believes that his employment difficulties stem from the fact that Krigel's refused to give him a recommendation and on at least one occasion told a prospective employer not to hire him. He believes he would have been an even more successful salesman and would have progressed in management had he not been sexually harassed and discharged in retaliation for complaining about his and the other plaintiffs' sexual harassment.

### D. Ms. Fuller

Ms. Fuller alleges that she was sexually harassed by Mr. Shine and Mr. Gross while she was an employee of one of the defendants and her harassers held supervisory power over her. Ms. Fuller offered the following testimony in support of her claim. Ms. Fuller was interviewed by Mr. Shine and John Hepting[37] at defendant Krigel's of Metcalf South, Inc. in June of 1990. Mr. Shine called her at her then current job as a Dillards' salesperson a few days later to offer her a sales position.[38] Ms. Fuller accepted the position because she felt she had a better opportunity to get into management at Krigel's than at Dillards. Before and while Ms. Fuller was employed at Krigel's she was never given an employee handbook and was never informed that Krigel's had a sexual harassment or an "open door" policy.

Ms. Fuller began working at the Metcalf store immediately. She was soon told that she was selling well and that she could reach the management level soon if she kept up her efforts.[39] On June 2, 1991, Ms. Fuller was promoted by Mr. Shine to sales manager of the Metcalf store because she was "doing well."[40] Mr. Shine indicated that he, without input from anyone else, had made the decision to promote her. As the sales manager, Ms. Fuller's responsibilities included closing the store, balancing the merchandise and the money, and physically locking the store. By this point in her career, Ms. Fuller had developed her own client base with which she kept in contact.

Mr. Shine and Mr. Gross immediately began sexually harassing her. Mr. Gross, who worked at a different store, would harass her over the phone during business hours. Mr. Gross would identify himself as "Vinny" and describe his penis and tell her that he could sexually satisfy her. Ms. Fuller never en-

---

**36.** Mr. Harrison made $31,385 in 1991, $12,210 in 1992, $24,420 in 1993–95.

**37.** John Hepting was the manager of the Metcalf store at the time.

**38.** Mr. Shine asked if Ms. Fuller had a problem selling him gift packages for his wife, his secretary and his mistress. She recognized his voice and thought this was a selling test. She said she

would have no problem making such a sale. Upon hearing her answer, Mr. Shine offered her the position.

**39.** In March of 1991, Ms. Fuller met her monthly sales goal and received a $300 bonus.

**40.** This was her second consideration for a promotion. She was not promoted on her first consideration.

couraged or welcomed Mr. Gross' conduct. She reported Mr. Gross' conduct to Mr. Brian Fuller [41] and Mr. Shine. Mr. Shine responded by saying that is just how Vinny is.

Mr. Shine's dirty jokes and sexual innuendos were common on the sales floor during business hours.[42] Ms. Fuller never encouraged or welcomed Mr. Shine's conduct. By August of 1990, Mr. Shine began to focus his constant sexual attention toward Ms. Fuller.[43] Mr. Shine would compel her to go to the foodcourt with him so he could ask her personal questions of a sexual nature.[44] On one occasion at the foodcourt, Mr. Shine told Ms. Fuller that she was acting upset. She told Mr. Shine that she and her boyfriend were not getting along. He said that her problem was that she was not getting enough sex and that he knew how to take care of her "problem."

Mr. Shine also enjoyed describing, in graphic detail, how he wanted to perform oral or anal sex with Ms. Fuller and discussed with her what he called a "Golden Shower [45]." He also enjoyed deliberately rubbing up against Ms. Fuller in a sexual manner even while she was with a customer.[46] After taking time to compose herself, Ms. Fuller would tell Mr. Shine that she found his comments and conduct offensive. Mr. Shine responded that she liked it and she knew it.

On numerous occasions, Mr. Shine asked Ms. Fuller to go on a business trip to St. Louis with him for the purpose of having sex.[47] Ms. Fuller reported Mr. Shine's conduct to Brian Fuller, the assistant store manager of the Metcalf store, and Mr. Hepting, who told her not to make Mr. Shine mad because he would retaliate against her and everybody else.

Mr. Shine's sexual harassment culminated in August of 1991 when Ms. Fuller broke her key off in the lock while trying to close the store. She called Mr. Shine who quickly arrived and ordered everybody except Ms. Fuller to leave. Mr. Shine sexually assaulted Ms. Fuller in the store while they waited for the locksmith to arrive.[48] While he was molesting her, Ms. Fuller bit Mr. Shine's lip in her attempt to fight him off. Later that night, Ms. Fuller was so upset that she vomited. After regaining her composure, she contacted Mr. Harrison and Mr. Fuller and told them what happened. Mr. Harrison said he did not know what she should do and Mr. Fuller told her not to do anything because Mr. Shine would retaliate against her. The next morning, Ms. Fuller reported the incident to her store manager, Mr. Hepting, and told him that she would not speak to Mr. Shine.[49] Mr. Shine apologized to Ms. Fuller the next day.

A few days after the "key" incident, Ms. Fuller gave Mr. Hepting her two weeks' notice. She told Mr. Hepting that she could not work at Krigel's anymore because of Mr.

41. Mr. Fuller was assistant manager at the Metcalf South store. He and the plaintiff then known as Leanne Alexander were married after she left Krigel's employment.

42. For example, Mr. Shine would tell her that he could see the underwear of women walking up a nearby staircase.

43. For example, Mr. Shine would tell her that he knew she was wearing a garter belt and that he thought she was kinky. She believes Mr. Shine knew she was wearing a garter belt from deliberately rubbing up against her.

44. She feared Mr. Shine. If she refused to go to the foodcourt with Mr. Shine he would violently explode at her and other employees. Mr. Shine often told employees not to "fuck him over." Several other employees warned her that she should not cross Mr. Shine.

45. Testimony at trial indicated that a Golden Shower is one person urinating on another person for sexual pleasure.

46. The rubbing while she was with a customer made selling very difficult.

47. Ms. Fuller also testified that Mr. Shine wanted her to go with him to a cross-dressing bar in St. Louis, pick up a man dressed as a woman, and have sex with him while Mr. Shine watched.

48. Ms. Fuller testified that Mr. Shine grabbed her breast and tried to kiss her.

49. She admitted that she did not ask Mr. Hepting to take any action. She believed that reporting the incident was enough and that Mr. Hepting should have done something. She did not go over Mr. Hepting's head because she feared retaliation.

Shine's constant sexual harassment.[50] Due to an illness, Ms. Fuller was unable to work the August sale. No one from Krigel's corporate headquarters ever called Ms. Fuller to ask her about her resignation. Ms. Fuller filed a charge of sexual harassment and constructive discharge with the EEOC in January of 1992.

After leaving Krigel's, Ms. Fuller took a serving position at the Long Branch Saloon.[51] She began doing part time temporary work through the Linde Group.[52] She eventually got a full-time, non-sales position with Cellular One as a receptionist.[53] She was promoted and became an hourly employee in 1993.[54] Ms. Fuller currently holds the same position and has been the recipient of several awards, including trips to Hawaii and Cancun, Mexico.[55]

### E. Other Plaintiffs' Witnesses
#### 1. Wendy Gilbert

Ms. Gilbert testified that in the summer and early fall of 1991 she was sexually harassed by Mr. Shine and that she was subjected to a hostile work environment due to Mr. Shine's harassing conduct while she was employed at Krigel's of Metcalf South. She gave two examples of Mr. Shine's physical harassment. First, she testified that Mr. Shine lifted her skirt up to her thigh without her permission. Second, Mr. Shine backed her into a file cabinet and asked her whether she was intimidated, to which she responded yes. Ms. Gilbert also testified that Mr. Shine asked her to have sex with him and asked if she was going to have a "quickie" with her boyfriend. She reported Mr. Shine's conduct to Mr. Fuller, who said he

could not do anything because Mr. Shine was his boss. She then reported Mr. Shine's conduct to Mr. Harrison, who said he would talk to Scott Krigel.

#### 2. Ed Clancy

Mr. Clancy testified that he is currently the vice president of finance for Krigel's, Inc. and that he held this position in 1991. He further testified about the structure of Krigel's, Inc. and the Krigel's jewelry stores. Krigel's, Inc., which is wholly owned by the Krigel family, manages and owns 100% of all the Krigel's jewelry stores, which are separate corporations. A customer could use a Krigel's charge card obtained at one store at any of the Krigel's stores. All the Krigel's stores use common advertising, jointly borrow money, have a joint payroll, have a common wage and fringe benefits program, and have a single personnel department located at Krigel's, Inc., otherwise known as Krigel's corporate headquarters.

#### 3. Scott Krigel

Scott Krigel testified that he is currently the president of Krigel's, Inc. and the Krigel's stores, and that he held a position of similar power in 1991. Mr. Krigel stated that he was involved in the hiring process although he did not interview every prospective employee.[56] He did state that any termination of any employee and any promotion involving a managerial position was his decision. He admitted that Krigel's had no written sexual harassment policy during the period of the alleged sexual harassment. He also admitted that Krigel's had no employee

50. She admits that she was not pleased with Krigel's new pay plan which was going to take effect on September 1, 1991. She further testified that the plan had nothing to do with her quitting her job at Krigel's and that she loved selling jewelry and would have stayed at Krigel's if she did not have to work with Mr. Shine.

51. She made $2.01 per hour plus tips. She made a total of $4,652.85 while working at the Long Branch Saloon in 1991. She made a total of $12,381 while working at the Long Branch Saloon in 1992.

52. She made a total of $744.01 while working part-time for the Linde Group in 1992.

53. She made a total of $1365.39 while working part-time for Cellular One in 1992.

54. Ms. Fuller now makes between $19,000 and $20,000 per year depending on how much overtime she is asked to work.

55. The value of these trips was included in Ms. Fuller's 1994 taxable income.

56. Mr. Krigel remembers personally hiring Ms. Eichenwald, but does not remember meeting Mr. Harrison.

handbook or written "open-door" policy although he believes that the "open-door" policy was widely known and utilized. He further testified that he terminated Mr. Shine when he discovered that he was stealing from the company, that he briefly discussed on the telephone with Ms. Richman why she was leaving, and that he was unaware of any other allegations of sexual harassment until he saw the plaintiff's EEOC filings.

### 4. Karen Green

Karen Green testified that she has been Krigel's vice president of merchandizing since the middle of 1991 and that her responsibilities include purchasing of inventory for all the stores, hiring prospective employees, and terminating employees. She admitted that she was not aware that the Krigel's standard employment agreement states that Krigel's, Inc. is the employer, not the individual stores. She further testified that she is on the same power level as Mr. Shine and that she, as well as Mr. Shine, had the power to fire employees.

### 5. Brian Fuller

Brian Fuller was the assistant store manager at the Metcalf store during the alleged sexual harassment. Although Mr. Fuller did not see Mr. Shine harass Ms. Fuller or any other plaintiff[57], he did hear Mr. Shine make lewd sexual comments. He testified that Ms. Fuller complained to him about Mr. Shine's conduct.[58] He told Mr. Hepting what Ms. Fuller told him. Mr. Hepting did not respond. In his signed EEOC affidavit, Mr. Fuller stated that he did not "speak" to Mr. Hepting about Ms. Fuller's problem with Mr. Shine. Mr. Fuller testified that he meant he never filed a formal written complaint with Mr. Hepting when he used the term "speak" in his EEOC affidavit. Mr. Fuller did not report Ms. Fuller's problem to anyone above Mr. Hepting because he was physically and emotionally intimidated by Mr. Shine and

because he was afraid of losing his job. Mr. Fuller was terminated in June of 1992 by Scott Krigel and Ed Clancy because of his low sales production and because "sometimes people just do not work out."

## V. Defendant's Evidence

### A. Robert Ward

Robert Ward was employed at Krigel's from November of 1990 to June of 1995 when he took a better paying position in Texas. He offered the following testimony on the defendants' behalf. On September 7, 1991, Mr. Harrison complained to him about Mr. Shine stealing commissions and sexually harassing some of the female employees. Mr. Ward called Richard Krigel, Scott Krigel's father, because Scott Krigel was out of town and informed him of Mr. Harrison's complaint. Shortly thereafter, Mr. Shine was terminated and Mr. Ward became vice president of operations. His first act as vice president was to investigate a sexual harassment allegation by Denise Scalco, an employee at the Metcalf store, against Mr. Harrison. Mr. Ward transferred Ms. Scalco to the Mission Center store to get her away from Mr. Harrison. On December 1, 1991, Mr. Harrison called Mr. Ward complaining about his store manager and threatening to quit. Mr. Ward told Mr. Harrison to call Scott Krigel. Mr. Harrison called Mr. Ward and told him that he would stay through Christmas Eve.

### B. Robert Shine

Robert Shine worked for Krigel's from 1975 to September of 1991, when he was terminated because he was stealing from the company. He testified that he did not remember making or directing any inappropriate remarks toward any of the plaintiffs. He testified that he had crude, two-way conversations with Mr. Harrison because that is the way Mr. Harrison talked and acted.[59] He

---

**57.** Mr. Fuller did see Mr. Shine take Ms. Fuller out of the store on numerous occasions.

**58.** He mentioned two episodes about which Ms. Fuller told him. First, Mr. Shine told Ms. Fuller that he would love to sit her down on a bench in the hallway of the shopping center and go down on her. Second, Mr. Shine told Ms. Fuller that

he wanted her to go to St. Louis with him so they could have sex and so he could watch her have sex with a transvestite.

**59.** Mr. Shine stated that Mr. Harrison often commented on women walking by the store and that he even chased one woman down the hallway of the shopping center.

stated that he does not believe that his behavior was ever inappropriate, but did admit that his conduct with Ms. Fuller was morally wrong. Mr. Shine testified that in the fall of 1990 Ms. Fuller and he began a welcome "sexual talk" relationship similar to phone sex.[60] Their first "sexual talk" encounter occurred when he took Ms. Fuller down to the foodcourt because he wanted to ask what was bothering her in private. She told him that she was having problems with her boyfriend. Specifically, her boyfriend was hurting her during sex because his penis was so large. Mr. Shine stated that Ms. Fuller never indicated that she did not want to participate in these "sexual talks" and that he regretted that it got out of control on the night of the "key" incident.

Mr. Shine's version of the "key" incident is as follows: Ms. Fuller called him after breaking her key in the lock; he initiated a sexual conversation which led to kissing; Ms. Fuller lifted up her blouse and he took off her bra; Ms. Fuller grabbed his crotch. The incident ended when Mr. Shine stopped. Mr. Shine apologized to Ms. Fuller the next day and told her that they had to stop their "sexual talks." They never engaged in sexual talks again. Mr. Shine admitted that he had stolen from Krigel's and that he was asked to leave. He is currently working for a family owned jewelry business in Denver.

### C. Scott Krigel

Scott Krigel testified about firing Mr. Shine, about his contacts with the plaintiffs and about his knowledge concerning the alleged sexual harassment. He stated that he was unaware of Mr. Shine's sexual conduct when he fired him and that he fired Mr. Shine for the sole reason that he was stealing from the company. When he learned of Mr. Shine's sexual conduct, he called Ms. Richman to ask her about it. Ms. Richman did not give him many details and he did not pursue it further.

Scott Krigel learned of the EEOC filings in January of 1992. Mr. Shine was the only alleged harasser mentioned by name in the EEOC filings. Upon learning of the sexual harassment allegations in the EEOC filings,

Scott Krigel immediately hired his brother's law firm as counsel to investigate. He did not learn of the sexual harassment allegations against Mr. Ward, Mr. Stein, and Mr. Gross until the plaintiffs filed their lawsuit.

Scott Krigel does not believe that the Krigel's employees perceived Mr. Shine as having the power to fire or transfer them. He also does not believe that Mr. Shine's conduct constituted sexual harassment.

Scott Krigel also testified that he never promised Mr. Harrison that he would become a manager of a store within three months. He stated that Mr. Harrison could not have become a manager because he lacked the people skills and because he could not control himself. He stated that Mr. Harrison had quit three times during his Krigel's employment. Scott Krigel accepted Mr. Harrison's third resignation early because Mr. Harrison was telling everyone that he was not going to stay until Christmas Eve like he promised. Scott Krigel took Mr. Clancy with him when he accepted Mr. Harrison's resignation because he was not sure what Mr. Harrison would do.

Scott Krigel also discussed the sales abilities of Ms. Fuller, Ms. Eichenwald, and Ms. Richman. He stated that Ms. Fuller's sales had fallen dramatically after she was promoted to sales manager. He stated that Ms. Richman was given a chance at sales, she was not successful, and was subsequently returned to her office position. He also stated that Ms. Eichenwald's sales were sub-average at best. He further stated that he did not understand why Ms. Eichenwald did not tell him about being sexually harassed when she was working at the corporate headquarters with him. He believes that Ms. Eichenwald knew about the "open-door" policy and that she should not have been afraid to use it due to their previous personal relationship.

### D. Susan Krigel

Susan Krigel, the wife of Scott Krigel, testified that she had a fairly close relationship with Ms. Eichenwald because Ms. Ei-

---

**60.** Both Ms. Fuller and he discussed what sexual acts they wanted to perform on each other.

chenwald baby-sat for her kids. She further testified that she did not recall Ms. Eichenwald ever mentioning Mr. Stein's comments about her chest. If Ms. Eichenwald had mentioned such comments, Susan Krigel stated that she would have confronted Mr. Stein immediately because she thought of Ms. Eichenwald almost as a niece.

### E. Denise Scalco Wheeler

Ms. Wheeler worked at the Metcalf store from May of 1991 to September of 1991 when she was transferred to the Mission Center store upon her request. While working at the Metcalf store, she dated her assistant manager, Mr. Harrison. Ms. Wheeler testified about three incidents involving Mr. Harrison and Ms. Fuller. First, she stated that in July of 1991 she was at the Long Branch Saloon with Mr. Harrison and Ms. Fuller when they discussed how they were going to get rid of Mr. Hepting so they could get into management positions at the Metcalf store. Ms. Fuller boasted that she could get Mr. Shine to put them in the management positions because she knew how to get what she wanted from him. Second, she stated that she offered to stay with Ms. Fuller and Mr. Shine on the night of the "key" incident, but Ms. Fuller told her to go home. Third, in late August, Ms. Wheeler stated that Ms. Fuller tricked her into meeting Mr. Harrison at Tanners, a bar, after she had broken up with him. Ms. Fuller immediately left her alone with Mr. Harrison. Her purse was in Ms. Fuller's car and, therefore, she could not leave. Mr. Harrison drove Ms. Wheeler home. Outside her house, Mr. Harrison became verbally abusive. After that night, Mr. Harrison tried to get Ms. Wheeler fired. Ms. Wheeler informed her superiors that she was quitting. Karen Green set up a meeting with Ms. Wheeler to discuss her reasons for quitting. During their meeting Ms. Wheeler complained about being sexually harassed by Mr. Harrison. Ms. Green apologized and told Ms. Wheeler that if she would stay, she

would arrange a transfer to the Mission Center store. Ms. Wheeler agreed and still works for Krigel's.

### F. Ed Clancy

Mr. Clancy, Krigel's vice president of finance, testified about the Krigel's compensation plan which went into effect September 1, 1992, and estimated what he thought the plaintiffs would have made under the then new system. Krigel's employees make a percentage of whatever they sell. Under the old system, a salesperson's yearly salary was 8% of what he or she sold plus any bonuses for meeting a sales goal. Each week every salesperson received a draw against 8% of his or her estimated sales for that year. That usually amounted to a salary between $250 and $350 per week plus 3% of the person's sales. Under the new pay plan, which took effect on September 1, 1991, the annual percentage rate was increased from 8% to 8.88%. The principal difference between the old and new plans, however, was that the new plan looked at the salesperson's previous three months to determine what his or her estimated yearly sales were going to be. Mr. Clancy developed a system that indicated how much a salesperson should sell in each particular month by looking at previous store performances. For instance, a salesperson sold more jewelry in August [61] and December [62] than in March [63]. Mr. Clancy's system weighted August and December more because the salesperson sold more in those months.

Mr. Clancy testified that Ms. Richman worked as a salesperson for 42 days, during which her total sales were $5806. Mr. Clancy believes that Ms. Richman's total sales number is low.[64] Under Krigel's new compensation system, Mr. Clancy estimates that Ms. Richman would have sold about $52,000 worth of merchandise that year, which would put her at the lowest compensation level. He further testified that good salespeople are

---

**61.** A Krigel's salesperson was expected to make 10.52% of his or her yearly sales in August.

**62.** A Krigel's salesperson was expected to make 20.25% of his or her yearly sales in December.

**63.** A Krigel's salesperson was expected to make 6.28% of his or her yearly sales in March.

**64.** Mr. Clancy stated that Ms. Richman's sales were good for an office person, but not for a salesperson.

good immediately and that salespeople do not improve much over time. He also stated that it is very rare for an office person to become a salesperson. When it is done, the person is usually given a "couple month" trial period.

Mr. Clancy testified that he was present when Scott Krigel accepted Mr. Harrison's resignation early. Mr. Harrison responded that he understood and that he would have done the same thing had he been in their shoes.

Mr. Clancy also prepared two charts indicating how Ms. Eichenwald and Ms. Fuller would have been compensated under Krigel's new compensation system. Based upon Ms. Eichenwald's 1990 sales figures, Mr. Clancy stated that her compensation would have gone down under the new system. Based upon Ms. Fuller's 1990 and 1991 sales figures, Mr. Clancy also stated that her compensation would have gone down under the new system.

### G. Cross Examination of Plaintiffs
#### 1. Ms. Eichenwald

Ms. Eichenwald testified that she made more money when she was in a non-sales position at Krigel's corporate headquarters. She also admitted that she had a close enough relationship with Susan Krigel that she borrowed her Halloween costume on at least one occasion.

Ms. Eichenwald also admitted that she was not successful as a salesperson for National Cable and that she does not know much she would have sold or been compensated under Krigel's new compensation system. She stated that she is making $26,000 plus commissions at her current job.

#### 2. Ms. Richman

Ms. Richman admitted that in December, 1994, she turned down a sales job with Lewis Toyota in Topeka, which could potentially have paid pay her $30,000 per year because it was purely based on commissions and because she would have had to work long hours. She also admitted that she chose to take a job as a server at a Topeka restaurant instead of a job with a Topeka Express store

which paid $19,500, which is more than she ever made while working at Krigel's. Ms. Richman stated that she did not understand Krigel's compensation system and that she did not know whether her Krigel's performance was good or how much she would have sold in 1992, 1993, and 1994 under Krigel's new compensation system had she remained at Krigel's.

Ms. Richman further admitted that she never complained to anyone about being sexually harassed and that she had a sexual relationship with Mr. Harrison while she worked at Krigel's. She eventually met with the other plaintiffs and discussed filing an EEOC complaint.

#### 3. Mr. Harrison

Mr. Harrison admitted that he had casual sexual relations with Ms. Gilbert and Ms. Richman, that he took a gun into a Krigel's store on one occasion, and that he has come to work hung-over a few times. Mr. Harrison denied that he quit three or four times. He claims that his employment record and his EEOC affidavit are incorrect. Mr. Harrison also stated that he has owned a tanning salon, a clothing store, and a small residential rental property, but has not made an attempt to go into business for himself since leaving Krigel's. Mr. Harrison admitted that he has been supported by his mother in the past. He also admitted that, although he could not afford tuition to go back to school, his mother gave him money to buy a new car. Mr. Harrison stated he has made only one attempt to find work outside of his home area in Arkansas.

#### 4. Ms. Fuller

Ms. Fuller stated that she was disappointed that Brian Fuller did not report Mr. Shine's conduct to someone higher than Mr. Hepting like she asked him to do. She admitted that she never reported Mr. Gross' conduct and that Mr. Gross never held a position of authority over her. She stated that Krigel's new compensation plan upset her. Ms. Fuller testified that she could have returned to Krigel's and asked for her job back after she heard Mr. Shine was terminated, but she chose not to. She admitted

that she did not know how much she would have sold or what her compensation would have been under Krigel's new compensation plan, but she believes she would have sold better had she not been sexually harassed. Ms. Fuller also admitted that her future husband, Brian Fuller, was involved in the decision to promote her to sales manager.

Ms. Fuller also stated that she has a 401(k) retirement plan [65], better medical benefits, works ten fewer hours per week, and has unlimited local use of a cellular phone at her new job. Ms. Fuller won two trips, which are valued at over $5,000, for being a good employee. She also admitted that she turned down a potentially higher paying sales job at her company.

## VI. The Court's Credibility Determinations

The court finds Ms. Eichenwald to be a credible witness. Her testimony and demeanor convinces the court that she is telling the truth and that she was subjected to unwelcome sexual harassment by Mr. Stein, Mr. Shine and Mr. Gross. The court is persuaded that Ms. Eichenwald did not complain to anyone in Krigel's management because she was embarrassed and intimidated by her harassers. Moreover, Ms. Eichenwald was nineteen years old when she was sexually harassed by Mr. Stein and twenty-one when she was sexually harassed by Mr. Shine and Mr. Gross. Her age and relative inexperience in the workforce are also factors that lend credence to her version of events despite the lack of protest by her.

The court finds Ms. Richman to be a credible witness. Her testimony and demeanor convinces the court that she is telling the truth and that she was subjected to unwelcome sexual harassment by Mr. Shine. The fact that she never complained about Mr. Shine's conduct does not persuade the court that Mr. Shine's conduct was welcomed. The court believes that Ms. Richman legitimately felt that she would lose her job if she crossed Mr. Shine, whom she clearly believed held supervisory authority over her. The fact that Ms. Richman had a telephone conversation with Scott Krigel concerning Mr. Shine and did not go into the details about being sexually harassed by him does not convince the court that Mr. Shine's conduct was welcome or that she is not a credible witness. Her conversation with Scott Krigel occurred at the end of her employment at Krigel's. Clearly, Ms. Richman was fed up with Krigel's and it is not unreasonable for her to have refrained from elaborating on the abusive behavior of Mr. Shine.

The court finds Mr. Harrison not to be a credible witness. His demeanor, obvious volatility and self serving behavior all belie his tale of sexual harassment and retaliation. The court believes that he was a willing participant in Mr. Shine's sexual talks and that he encouraged them. The court concludes that Mr. Harrison is more probably using this suit as a vehicle to strike back at Krigel's for failing to promote him to store manager than that he has a bona fide complaint about the defendants' sexual related conduct toward him or about retaliation for any opposition to the treatment of the other plaintiffs.

Mr. Harrison was clearly not subjected to unwelcome sexual harassment or a hostile work environment based on his sex. Mr. Harrison thrived under Mr. Shine's regime until he realized that Mr. Shine was stealing commissions from him. The court does not believe that upon learning that Mr. Shine was stealing from him, Mr. Harrison suddenly developed the courage to stand up to him about the sexual harassment. When he took a stand against Mr. Shine, Mr. Harrison's main concern was his wallet.

Despite some misgivings, the court finds Ms. Fuller generally to be a credible witness. Ms. Fuller is closely tied to two people the court finds not to be totally credible, Brian Fuller [66] and Mr. Harrison. However, the nature of her testimony (which is largely undisputed by Mr. Shine concerning many of the more sordid details) and her demeanor

---

**65.** Ms. Fuller did not have a 401(k) plan at Krigel's.

**66.** The contradictions between Mr. Fuller's in court testimony and his EEOC affidavit would make it difficult to accept much of his testimony were it not otherwise corroborated.

while testifying, convinces the court that she is telling the truth that she was subjected to unwelcome sexual harassment by Mr. Shine and Mr. Gross.[67] Mr. Shine admits that he took Ms. Fuller out of the store on numerous occasions in order to engage her in explicit and lewd sexual talks. Ms. Fuller legitimately felt she would imperil her job if she crossed Mr. Shine. Moreover, when she complained to Mr. Shine about Mr. Gross' conduct, Mr. Shine condoned his conduct and basically told her to make the best of it. The court believes that is exactly what she tried to do in the entirety of this matter. It perhaps explains why she may have stated in front of Ms. Wheeler that she could get Mr. Shine to do what she wanted. Ms. Fuller may have believed that she should try to reap some benefit from a bad situation. Toleration does not equal welcoming, however. The court believes that, although Ms. Fuller did not welcome participating in Mr. Shine's sexual talks, she did so to protect her livelihood. It is significant that Ms. Fuller ended her employment at Krigel's shortly after Mr. Shine forcibly tried to take their relationship to a physical level. She had finally reached her limit.

### VII. Liability

#### A. Findings of Facts

1. Plaintiff Helene Eichenwald, a twenty six year old female, was employed part-time by defendant Krigel's of Bannister Mall, Inc. from July 2, 1987 to July 30, 1988 and full time at defendant Krigel's of Mission Center, Inc. from October 31, 1990 to January 1, 1991; defendant Krigel's of Bannister Mall, Inc. from January 1, 1991 to January 27 of 1991; defendant Krigel's, Inc. from January 27, 1991 to May 28, 1991; and defendant Krigel's of Bannister Mall, Inc. from May 28, 1991 to July 2, 1991.

2. As detailed in Section IV A, above, Mr. Stein, Ms. Eichenwald's supervisor, sexually harassed Ms. Eichenwald while she was employed as a part-time salesperson at defendant Krigel's of Bannister Mall, Inc.

3. After leaving defendant Krigel's of Bannister Mall, Inc. in 1988, Ms. Eichenwald mentioned Mr. Stein's conduct to Susan Krigel, the wife Scott Krigel. It is apparent that Susan Krigel shared this information with her husband.

4. As detailed in Section IV A, above, Mr. Shine, Ms. Eichenwald's supervisor, sexually harassed Ms. Eichenwald while she was employed as a full-time salesperson at defendant Krigel's of Mission Center, Inc.

5. Mr. Shine transferred Ms. Eichenwald to defendant Krigel's of Bannister Mall, Inc. Ms. Eichenwald contacted Scott Krigel and informed him that she knew Mr. Stein still worked at the Bannister store and that she did not want to work there if he was her supervisor. Scott Krigel admitted he was aware of Mr. Stein's 1988 conduct and that Mr. Stein was still employed at the Bannister store but was no longer in a supervisory position. Ms. Eichenwald agreed to work at the Bannister store.

6. Ms. Eichenwald understood the term "player", as used by Mr. Shine and Mr. Gross, to mean someone who is willing to play along with Mr. Shine's sexual harassment.

7. On January 27, 1991, Ms. Eichenwald was transferred to the corporate headquarters of Krigel's (defendant Krigel's, Inc.) to work with Scott Krigel on a special project. While working there, James Gross sexually harassed Ms. Eichenwald in person and over the phone. This sexual harassment was unwelcome. Mr. Gross made several lewd sexual statements to her, did a sexually explicit "Vinny" routine, and told Ms. Eichenwald that Mr. Shine said she was a "player."

8. As detailed in Section IV A, above, Mr. Shine sexually harassed Ms. Eichenwald while she was working at Krigel's corporate headquarters. This sexual harassment was unwelcome. Ms. Eichenwald did not report Mr. Shine's or Mr. Gross' conduct to Scott, Susan, Peggy, or Richard Krigel because she was afraid of the wrath of her harassers, especially Mr. Shine, which was confirmed by his manner of handling a customer complaint.

---

67. In the end, the court concludes that Mr. Harrison's opportunistic attempt to ride on the coat tails of the other plaintiffs does not undermine the basic truth of Ms. Fuller's account.

9. On May 28, 1991, Ms. Eichenwald was transferred back to the Bannister store where she held a sales associate position. As detailed in Section IV A, above, Mr. Shine continued to harass her when he was at the Bannister store, which was more than once a week. This sexual harassment was unwelcome. Ms. Eichenwald complained to Gary Pener, the manager of the Bannister store, about Mr. Shine's conduct. Mr. Shine asked if he could give her home phone number to his rich customer whom she had helped on one occasion. When Ms. Eichenwald refused, Mr. Shine informed her that she was being transferred to the Independence Center store. This transfer was seen by Ms. Eichenwald as a demotion because the Independence store is farther from her house and because it has a lower volume of sales, which means less potential for commissions. She also saw it as being punishment for her unwillingness to accede to his telephone number request. Whether her perception was correct or not, it was consistent with Mr. Shine's oppressive conduct and further exacerbated the hostile working environment. Ms. Eichenwald was so upset about the transfer that she could not leave her residence for four days. Ms. Eichenwald could not contact Scott Krigel during those four days because he was out of town at the time. She went to the Independence Center store for one day and decided to leave Krigel's instead of accepting Mr. Shine's transfer/demotion. When Ms. Eichenwald did reach Scott Krigel, he told her that he knew the whole story and that there was nothing else to talk about.

10. Ms. Eichenwald filed a charge of sexual harassment with the Equal Employment Opportunity Commission ("EEOC") in January of 1992.

11. Ms. Eichenwald's workplace was permeated with discriminatory intimidation that was so severe and pervasive as to alter the conditions of her employment and create an abusive working environment. All of Mr. Shine's and Mr. Gross' sexually harassing conduct was unwelcome by Ms. Eichenwald. Ms. Eichenwald never had a social relationship with Mr. Shine or Mr. Gross and she never encouraged their conduct.

12. On April 4, 1991, plaintiff Marla Richman, a female, was hired as a full time office associate at defendant Krigel's of Bannister Mall, Inc. by Mr. Shine. Mr. Shine, her supervisor, sexually harassed Ms. Richman while she was working at the Bannister store. Mr. Shine made unwelcome sexual comments and sexual advances toward her.

13. On May 28, 1991, Ms. Richman was transferred to defendant Krigel's of Metcalf South, Inc. and was promoted to a full-time sales position. She accepted this transfer and promotion because it had a greater earning potential. While working at the Metcalf store, Ms. Richman saw Mr. Shine more and, as a result, was sexually harassed by him more, as detailed in Section IV B, above.

14. Ms. Richman never had a social relationship with Mr. Shine and never encouraged his conduct. She was afraid to complain about his conduct because she perceived him as having power over her employment and because she believed he would find out about her complaint and retaliate. Ms. Richman could not afford to lose her job at Krigel's because it was her sole income and because she was living paycheck to paycheck. As a result of Mr. Shine's conduct and perceived power, Ms. Richman's job performance was adversely affected because she was nervous and jumpy whenever Mr. Shine was around, which was quite often.

15. On July 9, 1991, Ms. Richman was transferred back to the Bannister store and returned to an office position. She perceived her transfer as Mr. Shine's way of punishing her for not being a "player." Whether that is correct or not, it was consistent with Mr. Shine's oppressive conduct and further exacerbated the hostile working environment. Mr. Shine continued to harass Ms. Richman while she worked at the Bannister store. As a result of Mr. Shine's constant harassment, Ms. Richman gave two weeks' notice to Krigel's on August 26, 1991, and began looking for other employment.

16. On September 13, 1991, Ms. Richman heard that Mr. Shine was terminated. On September, 14, 1991, Ms. Richman's last day working at Krigel's, Scott Krigel called her at the Bannister store and informed her that

Mr. Shine had been terminated and asked her what sexual statements Mr. Shine made to her. Because the store was busy, Ms. Richman told Scott Krigel only the basics of Mr. Shine's conduct.

17. Ms. Richman's workplace was permeated with discriminatory intimidation that was so severe and pervasive as to alter the conditions of her employment and create an abusive working environment. Mr. Shine's conduct was unwelcome.

18. After leaving Krigel's, Ms. Richman filed a charge of sexual harassment with the EEOC in January of 1992.

19. Plaintiff Thomas Harrison, a male, was employed as a full-time sales associate by defendant Krigel's of Metcalf South, Inc. from February 4, 1991 to March 24, 1991. On March 24, 1991, Mr. Harrison was transferred to defendant Krigel's of Oak Park, Inc. and promoted to sales manager. On May 28, 1991, Mr. Harrison was transferred to defendant Krigel's of Bannister Mall, Inc. and demoted to a full-time sales associate. On September 1, 1991, Mr. Harrison was transferred back to the Metcalf store and promoted to assistant store manager. On December 9, 1991, Scott Krigel accepted Mr. Harrison's resignation 15 days early.

20. While Mr. Harrison was employed at Krigel's, Mr. Shine and he engaged each other in welcome sexual discussions concerning their sex lives and other employees.

21. While Mr. Harrison was employed at Krigel's, he witnessed Mr. Shine sexually harassing female employees. While he held a supervisory position at one of the Krigel's stores, Mr. Harrison received complaints from Ms. Gilbert and Ms. Fuller concerning Mr. Shine's unwelcome sexual conduct. Mr. Harrison never relayed these complaints to anyone until after he realized that Mr. Shine was stealing from him.

22. After he reported Mr. Shine's conduct toward Ms. Gilbert and Ms. Fuller to Gary Pener, Mr. Harrison met with Mr. Ward to discuss Mr. Shine's thefts and sexual harassment. After this meeting Scott Krigel contacted Mr. Harrison and informed him that Mr. Shine had been terminated and asked him to return to work. Mr. Harrison agreed and returned to the Metcalf store.

23. After Mr. Harrison's return to the Metcalf store, Mr. Ward questioned Mr. Harrison in response to a sexual harassment allegation by Ms. Wheeler against Mr. Harrison. During this discussion, Mr. Ward asked Mr. Harrison whether he was having sexual relations with any of his co-workers. This inquiry was in the course of Mr. Ward's legitimate investigation and was not sexually harassing in nature. Mr. Harrison responded that he had casual, sexual relations with many of his female co-workers.

24. In early December of 1991, Mr. Harrison gave two weeks' notice because he was upset at the fact that he had not become a store manager yet. He promised Scott Krigel that he would stay through Christmas Eve. Nevertheless, Mr. Harrison told numerous people that he was going to leave Krigel's before Christmas Eve regardless of what he promised Scott Krigel.

25. Upon hearing of Mr. Harrison's intention to leave before Christmas Eve, Scott Krigel and Ed Clancy went to the Metcalf store on December 9, 1991, and accepted Mr. Harrison's resignation. Upon hearing the news, Mr. Harrison told Scott Krigel and Ed Clancy that he understood and that he would have done the same thing had he been in their shoes. There is absolutely no credible evidence that Mr. Harrison was terminated in retaliation for opposition to the sexual harassment of any Krigel's employee, whether himself or anyone else.

26. Mr. Harrison filed a charge of sexual harassment and retaliation with the EEOC in January of 1992.

27. After leaving Krigel's, Mr. Harrison made little, if any, effort to find employment.

28. On June 26, 1990, plaintiff Leanne Alexander Fuller, a female, was hired as a full-time sales associate at defendant Krigel's of Metcalf South, Inc. by Mr. Shine. On June 2, 1991, Ms. Fuller was promoted by Mr. Shine to sales manager. It was Mr. Shine's decision to promote her. He did not receive any input from anyone in the Krigel's corporate headquarters.

29. Mr. Shine, who was in a supervisory position over her, sexually harassed Ms. Fuller while she was working at the Metcalf store. Mr. Shine made sexual comments and sexual advances toward her. Mr. Gross, who worked at a different Krigel's store, sexually harassed Ms. Fuller while she was working at the Metcalf store. This sexual harassment was unwelcome. Mr. Gross also made sexual comments and sexual advances toward her. The actions of Mr. Shine and Mr. Gross are described in detail in Section IV D, above.

30. Mr. Shine's harassment culminated in August of 1991 when he physically molested her at the Metcalf store. After regaining her composure, she contacted Mr. Harrison and Mr. Fuller and told them what had happened. Mr. Harrison told her that he did not know what she should do. Mr. Fuller told her not to do anything because Mr. Shine would retaliate. The next morning, Ms. Fuller reported the incident to Mr. Hepting and told him that she would not speak to Mr. Shine. Mr. Shine apologized to Ms. Fuller the next day.

31. A few days after the "key" incident, Ms. Fuller gave two weeks' notice because she could no longer tolerate Mr. Shine's constant sexual harassment. She agreed to work through Krigel's August sale. However, due to an illness, Ms. Fuller was unable to work the August sale. No one from Krigel's corporate headquarters ever called or asked Ms. Fuller about her resignation.

32. Ms. Fuller was not pleased with Krigel's new compensation plan which took effect on September 1, 1991. However, the court is persuaded that Ms. Fuller would have stayed if she had not been compelled to work in the hostile atmosphere generated by Mr. Shine.

33. Ms. Fuller's workplace was permeated with discriminatory intimidation that was so severe and pervasive as to alter the conditions of her employment and create an abusive working environment. The conduct of Mr. Shine and Mr. Gross was unwelcome.

34. Ms. Fuller filed a charge of sexual harassment with the EEOC in January of 1992.

35. Before and while Ms. Eichenwald, Ms. Richman, Mr. Harrison, and Ms. Fuller were employed at Krigel's, they were never given an employee handbook and were never informed or made aware that Krigel's had either a sexual harassment or an "open door" policy.

36. Ms. Eichenwald, Ms. Richman, and Ms. Fuller were sexually harassed because they are women.

37. Mr. Shine's and Mr. Gross' conduct toward Ms. Eichenwald, Ms. Richman, and Ms. Fuller was sufficiently severe and pervasive to create an abusive working environment. Mr. Shine's and Mr. Gross' conduct had the effect of unreasonably interfering with Ms. Eichenwald's, Ms. Richman's, and Ms. Fuller's work performance and, under the totality of the circumstances, created an intimidating, hostile, and offensive working environment. Mr. Shine's and Mr. Gross' conduct would have had the same impact on any reasonable employee.

38. Mr. Shine was the vice president of operations for the defendants while he and Mr. Gross sexually harassed Ms. Eichenwald, Ms. Richman, and Ms. Fuller. Mr. Shine held a supervisory position over the plaintiffs. Mr. Shine possessed the power to terminate and transfer any employee at any time. He was, in fact, perhaps the employee of the defendants who was permitted to exercise the most power other than the Krigel family group. He was the operation's "major domo", its de facto chief operating officer on a day in-day out basis.

39. Mr. Shine was aware of Mr. Gross' conduct toward Ms. Fuller.

40. Scott Krigel decided to transfer Ms. Eichenwald from the Bannister store to the Independence store before Mr. Shine asked if he could give her phone number to one of his rich clients. Ms. Eichenwald, therefore, did not suffer a tangible job detriment as a result of her refusing to give her phone number to Mr. Shine's rich customer. However, Ms. Eichenwald's perception that the two matters were linked contributed to the hostile environment in which she was compelled to work.

41. Ms. Eichenwald, Ms. Richman, and Ms. Fuller were constructively discharged when they were forced to quit due to the gender-based intolerable working conditions created by Mr. Shine and Mr. Gross. These intolerable working conditions are the result of the defendants' illegal discriminatory acts. A reasonable employee would view these working conditions as intolerable.

42. There is no factual causal connection between any of Mr. Harrison's protected activity and his termination. Mr. Harrison had already tendered his resignation to be effective on Christmas day. Scott Krigel chose to accept Mr. Harrison's resignation early because he heard that Mr. Harrison intended to break his promise and leave before Christmas. The early acceptance of Mr. Harrison's resignation was not a result of any protected action taken by Harrison.

43. The Krigel family owns 100% of defendant Krigel's, Inc. Krigel's, Inc. serves as corporate headquarters and manages and owns 100% of the stock of all the Krigel's jewelry stores, which are separately incorporated. Krigel's, Inc. and the Krigel's jewelry stores have the same officers.[68]

44. All Krigel's stores use a common advertising scheme, have a joint payroll, have common wages and fringe benefits plan, and have a single personnel department located at Krigel's corporate headquarters. All decisions concerning the above functions are made at Krigel's corporate headquarters.

45. A customer can obtain a Krigel's charge card at any Krigel's store. A customer can use that Krigel's charge card at any Krigel's jewelry store.

46. Employees and merchandise were freely transferred from one store to another. All employees signed employment agreements indicating that their employer was Krigel's, Inc., not the individual stores. Most prospective employees were interviewed by someone at Krigel's corporate headquarters.

47. The Internal Revenue Service requires that Krigel's, Inc. and the Krigel's jewelry stores file a consolidated tax return.

48. All of the stores' inventory is bought by someone at Krigel's corporate headquarters. Each store carries slightly different inventory because each store is in a different market.

49. While Mr. Shine was vice president of operations, he had the power to hire, fire, and transfer employees on his own initiative. That fact is established in the testimony of Karen Green and elsewhere. Because Mr. Shine held such a high position with the defendants and because the employees correctly perceived that Mr. Shine possessed the power to materially affect their employment, there is a sufficient factual basis for imputing liability for Mr. Shine's acts to the defendants. Moreover, because Mr. Shine was aware of Mr. Gross' conduct, there is also a strong factual basis for imputing liability for Mr. Gross' acts on the defendants.

### B. Conclusions of Law

■ 1. Based upon its findings of fact, the court concludes that Ms. Eichenwald was subjected to a hostile work environment which was created by Mr. Shine, who held a supervisory position over her, and Mr. Gross. Mr. Shine's and Mr. Gross' conduct was unwelcome. Mr. Shine and Mr. Gross harassed her because she is a woman. Mr. Shine's and Mr. Gross' harassment was sufficiently severe and pervasive to create an abusive working environment.

2. Based upon its findings of facts, the court concludes that Ms. Richman was subjected to a hostile work environment which was created by Mr. Shine, who held a supervisory position over her. Mr. Shine's conduct was unwelcome. Mr. Shine harassed her because she is a woman. Mr. Shine's harassment was sufficiently severe and pervasive to create an abusive working environment.

3. Based upon its findings of facts, the court concludes that Ms. Fuller was subject-

---

**68.** For example, Scott Krigel is the president of Krigel's, Inc. and all of the Krigel's jewelry stores.

ed to a hostile work environment which was created by Mr. Shine, who held a supervisory position over her, and Mr. Gross. Mr. Shine's and Mr. Gross' conduct was unwelcome. Mr. Shine and Mr. Gross harassed her because she is a woman. Mr. Shine's and Mr. Gross' harassment was sufficiently severe and pervasive to create an abusive working environment.

4. Mr. Shine's high-level, management position at Krigel's is a sufficient basis for imputing liability to the defendants for his sexual harassment of Ms. Eichenwald, Ms. Richman and Ms. Fuller. The fact that Mr. Shine had knowledge of Mr. Gross' conduct provides a sufficient basis for imputing liability to the defendants for Mr. Gross' sexual harassment.

5. Based upon its findings of facts, the court concludes that Mr. Harrison was not subjected to a hostile work environment while he was employed by any of the defendants. Plaintiff Harrison was not discriminated against because of his sex and he welcomed the conduct of Mr. Shine.

6. Mr. Gross' and Mr. Shine's conduct was sufficiently severe and pervasive such that a reasonable person in plaintiffs Eichenwald's, Richman's, and Fuller's positions would conclude that it poisoned the work atmosphere and altered their conditions of employment. As a result of this hostile work environment, plaintiffs Eichenwald, Richman, and Fuller were constructively discharged.

7. Based upon its findings of fact, the court concludes that plaintiff Harrison has not established his claim of retaliation. Mr. Harrison has completely and utterly failed to show how his resignation was the result of his opposing any illegally discriminatory conduct as required to state a retaliation cause of action under Title VII.

8. Based upon its findings of fact, the court concludes that the plaintiffs have established that defendant Krigel's, Inc.'s control over its stores exceeds that normally exercised by a parent corporation. *U.S. West,* 3 F.3d at 1362. All Krigel's stores use a common advertising scheme, have a joint payroll, have a common wages and fringe benefits plan, and have a single personnel department located at Krigel's corporate headquarters. All decisions concerning the above functions are made at Krigel's corporate headquarters. The Krigel family owns 100% of defendant Krigel's, Inc., Krigel's corporate headquarters. Krigel's, Inc. owns 100% of and manages all the Krigel's jewelry stores, which are separately incorporated. Krigel's, Inc. and the Krigel's jewelry stores share the same officers. A customer can obtain and use a Krigel's charge card at any Krigel's jewelry store. Employees and merchandise are freely transferred from one store to another. All employees sign employment agreements indicating that their employer is Krigel's, Inc., not the individual stores. Krigel's, Inc. and the Krigel's jewelry stores file consolidated income tax returns. All of the stores' inventory is bought by someone at Krigel's corporate headquarters. Therefore, the court finds that the defendants should be treated as a single employer under the integrated enterprise test for purposes of liability under Title VII.

9. Because Mr. Shine was the vice president of operations and because Mr. Shine had the power to hire, fire and transfer any employee, the fact that no other Krigel's officer was aware of the harassment is irrelevant for the purposes of imputing liability to the defendants. Under basic agency principles Mr. Shine was clearly the agent of the defendants. Mr. Shine had both actual and apparent authority to act on behalf of the defendant. The defendants, therefore, are responsible for Mr. Shine's conduct based upon his position and power within Krigel's everyday operations. As a result, the defendants also had notice of Mr. Gross' conduct because Mr. Shine was aware of it.

### VIII. Remedy in the form of Back Pay

#### A. Findings of Fact

1. Based upon the testimony and other evidence presented, the court finds that Ms. Eichenwald's post-Krigel's earnings are:

1995 earnings = $ 9,880 [69] + $800 [70] + $4,000 [71] = $14,680
1994 earnings = $22,907 [72]
1993 earnings = $ 5,318 [73]
1992 earnings = $14,013 [74]
1991 earnings = $ 5,906 [75]

---

2. Based upon the testimony and the evidence presented, the court finds that Ms. Eichenwald's earnings while employed at Krigel's were:

1991 earnings = $991.00 [76] + $6,121.79 [77] + $4648.90 [78] = $11,761.69
1990 earnings = $1,787.71 [79]

---

3. Based on Mr. Clancy's formula, which weighs each month according to what percentage of a salesperson's yearly sales is performed in that month, and which the court finds to be a reasonably accurate method to approximate earnings, and applying it to the available data, the court finds that Ms. Eichenwald would have sold $224,568 worth of merchandise if she had worked all of 1991 as a salesperson.[80]

4. Using Mr. Clancy's formula, the court finds that Ms. Eichenwald would have sold $38,311.30 worth of merchandise from July through August of 1991.[81]

5. Applying Krigel's old pay scale [82], the court finds that Ms. Eichenwald would have

69. In 1995, Ms. Eichenwald worked nineteen weeks at Saks Fifth Avenue. She was paid $13 per hour. The court assumes she worked forty hours per week because there was no evidence introduced otherwise. $19 \times 40 \times 13 = 9880$.

70. In 1995, Ms. Eichenwald worked as a sales associate for National Cable Network for four weeks. She was paid $50 per sale. The court finds that she averaged four sales per week. $4 \times 4 \times 50 = 800$.

71. Ms. Eichenwald has been working for National Cable Network in a non-sales position since August 7, 1995. She is paid $500 per week. Ms. Eichenwald will have worked at National Cable Network for eight weeks on September 29, 1995. During those eight weeks she will have made $4,000. $8 \times 500 = 4000$.

72. Plaintiffs' Exhibit # 7: Ms. Eichenwald's 1994 tax return.

73. Plaintiffs' Exhibit # 1: Ms. Eichenwald's Personal Earnings and Benefit Estimate Statement from the Social Security Administration.

74. Plaintiffs' Exhibit # 1: Ms. Eichenwald's Personal Earnings and Benefit Estimate Statement from the Social Security Administration.

75. In 1991, Ms. Eichenwald made $17,667 according to her Personal Earnings and Benefit Estimate Statement from the Social Security Administration (plaintiffs' Exhibit # 1). Ms. Eichenwald made $11,761 while working for Krigel's in 1991. $17,667 − $11,761 = $5,906.

76. Plaintiffs' Exhibit # 6—Ms. Eichenwald's earning while a salesperson at Krigel's of Mission Center, Inc.

77. Plaintiffs' Exhibit # 5—Ms. Eichenwald's earning while a salesperson at Krigel's of Bannister Mall, Inc.

78. Plaintiffs' Exhibit # 5—Ms. Eichenwald's earning while working at Krigel's corporate headquarters.

79. Plaintiffs' Exhibit # 3—Ms. Eichenwald's earning while working at Krigel's of Mission Center, Inc.

80. Defendants' Exhibit # 436a.

81. July receives a 6.54% weight. August receives a 10.52% weight. .0654 + .1052 = .1706 × $224,568 = $38,311.30. The court assumes that Ms. Eichenwald would have continued to make $250 per week plus 3% commission had she stayed through July and August of 1991. Ms. Eichenwald would have made ($250 × 9 weeks) + (3% × $38,311.30) = $2,250 + $1149.34 = $3,399.34.

82. Krigel's new compensation plan was not instituted until September of 1991.

made $3,339.34 from July through August of 1991 based upon the conclusion that she would have continued to sell at her previous pace.

6. Using Mr. Clancy's formula, the court finds that Ms. Eichenwald would have sold $90,905.13 worth of merchandise from September through December of 1991.[83]

7. Applying Krigel's new pay scale, the court finds that Ms. Eichenwald would have made $6,696.21 from September through December of 1991 based upon the conclusion that she would have continued to sell at her previous pace.[84]

8. For all future years, the court finds that Ms. Eichenwald would have sold $225,-000 worth of merchandise per year. The court was not persuaded by the paucity of the plaintiffs' evidence that Ms. Eichenwald would have improved as a salesperson, sold more, or been promoted. There was no evidence presented from which the court could draw such conclusions, such as the overall performance of Krigel's employees or any witness with the ability to give an opinion about her future job performance. In the absence of such evidence, the court finds it probable that she would have continued to perform at approximately the same level she performed at in 1991.

9. Based upon the testimony and other evidence presented, the court finds that Ms.

Eichenwald's projected income had she remained at Krigel's would have been:

| | |
|---|---|
| 7/91–8/91 | = $ 3,339.34 |
| 9/91–12/91 | = $ 6,696.21 |
| 1992 | = $18,880 |
| 1993 | = $18,880 |
| 1994 | = $18,880 |
| 1/95–9/95 | = $13,280.70 [85] |

total lost income = $79,956.25

10. The court finds that Ms. Eichenwald's lost back pay is:

1991 $10,035.55 − $5,906 = $4,129.55
1992 $18,880 − $14,013 = $4,867
1993 $18,880 − $5,318 = $13,562
1994 $18,880 − $22,907 = $0
1995 $13,280.70 − $14,680 = $0
**Net Loss = $22,558.24**

11. Based upon the testimony and other evidence presented, the court finds that Ms. Richman's post-Krigel's earnings are:

1995 earnings = $ 3,814.68 [86]
1994 earnings = $17,233 [87]
1993 earnings = $18,727 [88]
1992 earnings = $18,791 [89]
1991 earnings = $10,955.73 [90]

12. Based upon the testimony and other evidence presented, the court finds that Ms. Richman's earnings while employed at Krigel's were:

1991 earnings = $3,658.81 [91] + $2,215.46 [92] = $5,874.27

13. Based on Mr. Clancy's formula, the court finds that Ms. Richman would have sold approximately $52,000 worth of mer-

---

**83.** September through December is given 40.48% weight under Mr. Clancy's formula. Therefore, Ms. Eichenwald would have sold (.4048 × $224,568 =) $90,905.13 worth of merchandise during that time period.

**84.** ($180 × 17 weeks) + (4% × $90,905.13) = $3,060 + $3,636.21 = $6696.21.

**85.** January through September is given a 65% weighing under Mr. Clancy's formula. Ms. Eichenwald would have sold in those months (.6523 × $225,000 =) $146,767.50 worth of merchandise. Her compensation during those months would have been $190 × 39 weeks + (4% × $146,767.50) = $7,410 + $5,870.70 = $13,280.70.

**86.** Plaintiffs' Exhibit # 12: Ms. Richman's Applebee's pay stub which is current through April 16 of 1995.

**87.** Plaintiffs' Exhibit # 10: Ms. Richman's 1994 tax return.

**88.** Plaintiffs' Exhibit # 11: Ms. Richman's Personal Earnings and Benefit Estimate Statement from the Social Security Administration.

**89.** Plaintiffs' Exhibit # 11: Ms. Richman's Personal Earnings and Benefit Estimate Statement from the Social Security Administration.

**90.** Ms. Richman's Personal Earnings and Benefit Estimate Statement from the Social Security Administration indicates she made $16,830 during 1991. According to her 1991 tax return (plaintiffs' Exhibit # 9), Ms. Richman made $5,874.27 working for Krigel's in 1991. Her non–Krigel's income in 1991 was $16,830 − $5,874.27 = $10,955.73.

**91.** Plaintiffs' Exhibit # 9: Ms. Richman's W–2 from Krigel's of Bannister Mall, Inc.

**92.** Plaintiffs' Exhibit # 9: Ms. Richman's W–2 from Krigel's of Metcalf South, Inc.

chandise if she had worked all of 1991 as a salesperson [93],[94].

14. Using Mr. Clancy's formula, the court finds that Ms. Richman would have sold $8,871.20 worth of merchandise from July through August of 1991.[95]

15. Applying Krigel's old pay scale, the court finds that Ms. Richman would have made $4,491.14 from July through August of 1991 based upon the conclusion that she would have continued to sell at her previous pace.[96]

16. Using Mr. Clancy's formula, the court finds that Ms. Richman would have sold $21,049.60 worth of merchandise from September through December of 1991.[97]

17. Applying Krigel's new pay scale, the court finds that Ms. Richman would have made $3,731.98 from September through December of 1991 based upon the conclusion that she would have continued to sell at her previous pace.[98]

18. For all future years, the court finds that Ms. Richman would have sold $52,000 worth of merchandise. The court was not persuaded by the paucity of the plaintiffs' evidence that Ms. Richman would have im-proved as a salesperson, sold more or been promoted. In the absence of such evidence, the court concludes it is probable she would have continued to perform at approximately the same level she performed at in 1991.

19. The court finds that Ms. Richman's projected income had she remained at Krigel's would have been:

| | |
|---|---|
| 7/91–8/91 | = $ 4,491.14 |
| 9/91–12/91 | = $ 3,731.98 |
| 1992 | = $ 8,840 [99] + $2,080 [100] = $10,920 |
| 1993 | = $10,920 |
| 1994 | = $10,920 |
| 1/95–9/95 | = $ 8,710 [101] |

total lost income = $49,693.12

20. The court finds that Ms. Richman's lost back pay is:

| | | |
|---|---|---|
| 1991 | $ 8,223.12 − $10,955.73 | = $0 |
| 1992 | $10,920 − $18,791 | = $0 |
| 1993 | $10,920 − $18,727 | = $0 |
| 1994 | $10,920 − $17,233 | = $0 |
| 1995 | $ 8,710 − $3,814.68 | = $4,895.32 |

**Net Loss** = $4,895.32

21. Based upon the testimony and other evidence presented, the court finds that Ms. Fuller's post-Krigel's earnings are:

| | |
|---|---|
| 1995 earnings | = $15,000 [102] |
| 1994 earnings | = $27,975.67 [103] |
| 1993 earnings | = $17,432 [104] |

93. The court finds that Ms. Richman's loss should be computed based upon her sales income because she was a salesperson at Krigel's of Metcalf South, Inc. when Mr. Shine's sexual harassment was the worst and because the court believes she would have remained a salesperson had she not rejected Mr. Shine's unwelcome advances.

94. Defendants' Exhibit # 436a.

95. June through August is given 17.06% weight under Mr. Clancy's formula. Therefore, Ms. Richman would have sold (.1706 × $52,000 =) $8,871.20 worth of merchandise during that time period.

96. (13 weeks × $325) + (.03 × 8,871.20) = $4,225 + $266.14 = $4,491.14.

97. September through December is given 40.48% weight under Mr. Clancy's formula. Therefore, Ms. Richman would have sold (.4048 × $52,000 =) $21,049.60 worth of merchandise during that time period.

98. ($170 × 17 weeks) + (4% × $21,049.60) = $2,890 + $841.98 = $3,731.98.

99. According to Defendants' Exhibit # 440, if Ms. Richman sold $52,000 worth of merchandise a year she would make $8,840 a year solely from her hourly wages.

100. .04 × $52,000 = $2,080.

101. January through September is given a 65% weighing under Mr. Clancy's formula. Ms. Richman would have sold in those months (.6523 × $52,000 =) $33,919.60 worth of merchandise. Her compensation during those months would have been ($170 × 39 weeks) + (4% × $52,000) = $6,630 + $2080 = $8,710.

102. Plaintiffs' Exhibit # 79: Ms. Fuller testified that her yearly income from her current job is $20,000. Because she is not eligible to win any trips this year, the court will assume her 1995 salary is $20,000 and that she has no other sources of income. Because the court is only awarding damages through September 29, 1995, the court is concerned with that portion of her 1995 income. 9/12 × $20,000 = $15,000.

103. Plaintiffs' Exhibit # 21: Ms. Fuller's 1994 tax return.

104. Plaintiff's Exhibit # 22: Ms. Fuller's Personal Earnings and Benefit Estimate Statement from the Social Security Administration.

1992 earnings = \$14,490 [105]
1991 earnings = \$4,652.85 [106]

22. Based upon the testimony and other evidence presented, the court finds that Ms. Fuller's earnings while employed at Krigel's were:

1991 earnings = \$16,537.69 [107]
1990 earnings = \$ 8,791.12 [108]

23. Based on Mr. Clancy's formula, the court finds that Ms. Fuller would have sold approximately \$183,391.07 worth of merchandise if she had worked all of 1991 as a salesperson. [109] ·

24. Using Mr. Clancy's formula, the court finds that Ms. Fuller would have sold \$9,646.37 worth of merchandise in the last half of August of 1991. [110]

25. Applying Krigel's old pay scale, the court finds that Ms. Fuller would have made \$1,039.39 during the last half of August of 1991 based upon the conclusion that she would have continued to sell at her previous pace. [111]

26. Using Mr. Clancy's formula, the court finds that Ms. Fuller would have sold \$74,236.71 worth of merchandise from September through December of 1991. [112]

27. Applying Krigel's new pay scale, the court finds that Ms. Fuller would have made \$5,859.47 from September through December of 1991 based upon the conclusion that she would have continued to sell at her previous pace. [113]

28. For all future years, the court finds that Ms. Fuller would have sold \$184,000 worth of merchandise. The court was not persuaded by the paucity of the plaintiffs' evidence that Ms. Fuller would have improved as a salesperson, sold more or been promoted. In the absence of such evidence, the court concludes that it is probable that she would have continued to perform at approximately the same level she performed at in 1991.

29. The court finds that Ms. Fuller's projected income had she remained at Krigel's would have been:

8/13/91–9/1/91 = \$ 1039.39
9/91–12/91 = \$ 5,859.47
1992 = \$ 8,840 [114] + \$7,360 [115] = \$16,200
1993 = \$16,200
1994 = \$16,200
1/95–9/95 = \$11,430.93 [116]

total lost income = \$66,929.79

105. Plaintiff's Exhibit # 22: Ms. Fuller's Personal Earnings and Benefit Estimate Statement from the Social Security Administration.

106. Plaintiffs' Exhibit # 18: Ms. Fuller's 1991 tax return indicates that she made \$16,537.69 while working for Krigel's in 1991. During the remainder of 1991, Ms. Fuller made \$4,652.85 as a server at the Longbranch Saloon.

107. Plaintiffs Exhibit # 18: Ms. Fuller's W–2 from Krigel's of Metcalf South, Inc.

108. Plaintiffs Exhibit # 17: Ms. Fuller's W–2 from Krigel's of Metcalf South, Inc.

109. The court finds that defendants' Exhibit # 438a incorrectly computes how much Ms. Fuller would have sold in 1991 if she had remained at Krigel's. Although Ms. Fuller's personnel record jacket indicates that she quit on August 27, 1991, she testified that she was unable to work the last part of August due to an illness. In order to compensate for this fact, the court will only take half of August's percentage weight to calculate her 1991 sales. \$99,508/54.26% = \$183,391.07.

110. Half of August is given 5.26% weight under Mr. Clancy's formula. Therefore, Ms. Fuller would have sold (.0526 × \$183,391.07 =) \$9,646.37 worth of merchandise during that time period.

111. (2.5 weeks × \$300) + (.03 × \$9,646.37) = \$750 + \$289.39 = \$1,039.39.

112. September through December is given 40.48% weight under Mr. Clancy's formula. Therefore, Ms. Fuller would have sold (.4048 × \$183,391.07 =) \$74,236.71 worth of merchandise during that time period.

113. (\$170 × 17 weeks) + (4% × \$74,236.71) = \$2,890 + \$2,969.47 = \$5,859.47.

114. According to Defendants' Exhibit # 440, if Ms. Fuller sold \$184,000 worth of merchandise per year she would make \$8,840 solely from her hourly wages.

115. .04 × \$184,000 = \$7,360 in commissions.

116. January through September is given a 65% weight under Mr. Clancy's formula. Ms. Fuller would have sold in those months (.6523 × \$184,000 =) \$120,023.20 worth of merchandise. Her compensation during those months would have been (\$170 × 39 weeks) + (4% × \$120,023.20) = \$6,630 + \$4,800.93 = \$11,430.93.

30. The court finds that Ms. Fuller's lost back pay is:

1991 $ 6,898.86 – $4,652.85 = $2,246.01
1992 $16,200 – $14,490 = $1,710
1993 $16,200 – $17,432 = $0
1994 $16,200 – $27,975.67 = $0
1995 $11,430.93 – $15,000 = $0
Net Loss = $3,956.01

### B. Conclusions of Law

1. Considerable discretion is vested in the district court when devising remedies for Title VII violations. *Estate of Pitre v. Western Elec. Co.*, 975 F.2d 700 (10th Cir.1992) (citing *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)). The district court's exercise of discretion in awarding back pay must be measured against Title VII's purposes which require that the remedy both provides an incentive to employers to avoid discriminatory practices and makes persons whole for injuries suffered on account of unlawful employment discrimination. *Id.*

2. Because the court has concluded that plaintiffs Eichenwald, Richman, and Fuller were unlawfully sexually harassed by Mr. Shine, Krigel's vice president of operations, the court may order relief in the form of back pay under Title VII. 42 U.S.C. § 2000e–5(g)(1).

3. The court concludes that the measurement of back pay here equals the difference between what the plaintiffs would have made at Krigel's had they stayed and not been sexually harassed and what the plaintiffs made after being constructively discharged from Krigel's. In other words, the court must estimate what each plaintiff would have made at Krigel's between the time of their constructive discharge and the time of trial. The court must then subtract from that amount the amount each plaintiff has made subsequent to their constructive discharge because the plaintiffs have a duty to mitigate their damages. *EEOC v. Sandia Corp.*, 639 F.2d 600 (10th Cir.1980).

4. The court concludes that the plaintiffs Eichenwald, Richman, and Fuller should be awarded back pay, because they were subjected to a hostile work environment while employed at Krigel's and because they were constructively discharged by Krigel's, in the amounts set forth above.

5. Because plaintiffs Eichenwald, Richman, and Fuller have prevailed upon their Title VII claims, they are entitled to recovery of their attorney's fees. 42 U.S.C. § 2000e–5(k). Counsel are referred to District of Kansas Rule 220 and are directed to follow this rule prior to filing any motion for statutory attorney's fees.

IT IS **THEREFORE ORDERED BY THE COURT** that judgment be granted in favor of plaintiff Eichenwald in the amount of $22,558.24, plaintiff Richman in the amount of $4,895.32, and plaintiff Fuller in the amount of $3,956.01 for their Title VII claims.

**IT IS FURTHER ORDERED BY THE COURT** that judgment be granted in favor of defendants for plaintiff Harrison's Title VII claim.

**IT IS SO ORDERED.**

### MEMORANDUM AND ORDER ON MOTION TO ALTER OR AMEND

### I. Introduction

This case comes before the court on defendant's motion (Doc. # 85) to alter or amend the court's Memorandum and Order filed October 12, 1995, pursuant to Federal Rule of Civil Procedure 59(e) or, in the alternative, for a new trial pursuant to Federal Rule of Civil Procedure 59(a). For the reasons set forth below, the court grants in part and denies in part defendants' motion.

### II. Discussion

### A. Standard for motion to alter or amend

A judgment can be altered or amended pursuant to Federal Rule of Civil Procedure 59(e) to correct manifest errors of fact or law, or to accept newly discovered evidence. *Buell v. Security Gen'l Life Ins. Co.*, 784 F.Supp. 1533, 1535 (D.Colo.1992), aff'd, 987 F.2d 1467 (10th Cir.1993), cert. denied, — U.S. —, 114 S.Ct. 308, 126 L.Ed.2d 255 (1993); *Dees v. Wilson*, 796 F.Supp. 474, 475 (D.Kan.1992). A motion to reconsider is appropriate if the court has

obviously misapprehended a party's position, the facts, or mistakenly has decided issues not presented for determination. *See Refrigeration Sales Co. v. Mitchell–Jackson, Inc.*, 605 F.Supp. 6, 7 (N.D.Ill.1983), *aff'd*, 770 F.2d 98 (7th Cir.1985). Motions to alter or amend are directed at reconsideration, not initial consideration. *Buell*, 784 F.Supp. at 1535. The proper analysis was succinctly and accurately stated in *United States v. One Parcel Property*, No. 91–2398–GTV, 1993 WL 289198 at *1 (D.Kan. August 18, 1993):

> Whether to grant or deny a motion for reconsideration is committed to the court's discretion. *Hancock v. City of Oklahoma City*, 857 F.2d 1394, 1395 (10th Cir.1988). In exercising that discretion, courts in general have recognized three major grounds justifying reconsideration: (1) an intervening change in controlling law; (2) availability of new evidence; and (3) the need to correct clear error or prevent manifest injustice. *Estate of Pidcock v. Sunnyland America, Inc.*, 726 F.Supp. 1322, 1333 (S.D.Ga.1989); *see Major v. Benton*, 647 F.2d 110, 112 (10th Cir.1981).

### B. Analysis

The defendants assert (1) that the court incorrectly held them liable for the hostile work environment created by Mr. Shine and Mr. Gross based on the fact that there was no evidence presented at trial that the defendants had any knowledge of the hostile work environment, (2) that liability of Mr. Shine's actions cannot be imputed to the defendants because there was substantial evidence presented that Mr. Shine did not have the authority to fire or transfer employees, (3) that the court incorrectly found that Ms. Eichenwald was constructively discharged from her employment with the defendants, (4) that the court erred in its back pay calculation for Ms. Richman, (5) that the court's method of calculating back pay was unreasonable and incorrect because it defeats the purpose of the remedy under Title VII, and (6) that the court failed to make findings on the issue concerning the plaintiff's efforts to mitigate their damages. The defendants also ask the court to find that the defendants are the "prevailing party" with respect to Wendy Gilbert and William Harrison's claims, there-

by entitling the defendants to an award of attorney's fees against these plaintiffs. The plaintiffs assert that the court's decision is proper, that the plaintiffs did mitigate their damages, and that the defendants are not the "prevailing party" with respect to the claims of Wendy Gilbert and William Harrison and, therefore, are not entitled to an award of attorney's fees against these plaintiffs.

### 1. Liability

 In *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court explained that a court must look to agency principles for guidance in determining when an employer is liable for hostile work environment sexual harassment by its employees in violation of Title VII. *Id.* at 72, 106 S.Ct. at 2408. In *Hicks v. Gates Rubber Co.*, 833 F.2d 1406 (10th Cir.1987), the Tenth circuit identified three alternative bases for employer liability in a sexual harassment case under Title VII. *Id.* at 1417–18.

> "An employer is liable for: (1) any tort committed by an employee acting within the scope of his or her employment; (2) any tort committed by an employee in which the employer was negligent or reckless; or (3) any tort in which the employee purported to act or speak on behalf of the employer and there was reliance upon apparent authority, or the employee was aided in accomplishing the tort by the existence of the agency relationship." *Hirase–Doi v. U.S. West Communications, Inc.*, 61 F.3d 777, 783 (10th Cir.1995) (citing *Hirschfeld v. New Mexico Corrections Dep't*, 916 F.2d 572, 576 (10th Cir.1990)).

The scope of employment basis for liability is largely inapposite in sexual harassment cases because harassing an employee is seldom within the job description of a supervisor in any business of good repute. *Campbell v. Kansas State University*, 780 F.Supp. 755, 763 (D.Kan.1991) (citing *Hicks·v. Gates Rubber Co.*, 833 F.2d 1406, 1417–18 (10th Cir. 1987)). Employer negligence subjecting the employer to liability for sexual harassment by its employee is defined as failing to take appropriate action to remedy or prevent a

hostile or offensive work environment about which management level employees knew, or in the exercise of reasonable care should have known. *Hirase–Doi,* at 783. This theory demands a two prong inquiry: whether the employer had actual or constructive knowledge of the sexual harassment; and, if so, whether the employer failed to remedy or prevent the violation. *Kansas State University,* 780 F.Supp. at 763. For Title VII purposes, apparent authority is evaluated under § 219(2)(d) of the Restatement (Second) of Agency, which states that a principal will be liable for the acts of his servant if "the servant purported to act or to speak on behalf of the principal and there was reliance upon apparent authority, or [the employee] was aided in accomplishing the tort by the existence of the agency relationship." *Campbell v. Board of Regents of State of Kansas,* 770 F.Supp. 1479, 1488–89 (D.Kan. 1991). The *Hirschfeld* court held that Title VII employer liability may be based on § 219(2)(d) only if the wrongdoer has supervisory authority over the plaintiff. 916 F.2d at 579.

■■■■ It is clear that the defendants are liable under the second and third bases. The defendants argue that because none of the Krigel family members were aware of Mr. Shine's conduct, the defendants did not have notice of his conduct and, therefore, are not liable. The court believes this argument is completely without merit because Mr. Shine, the de facto chief operating officer of the defendants, was an integral member of upper level management and, therefore, his conduct is imputed to the defendants just as the conduct of Scott Krigel, the president of the defendants, would be imputed to them. The defendants virtually desire a rule requiring that the president of a company must be aware of the fact that the chief operating officer is sexually harassing their employees for the company to be liable. The defendants' argument is not only wrong but it borders on absurdity because it would serve to insulate most employers from Title VII liability, something not intended by Congress when it enacted Title VII or the courts in their interpretation of Title VII. The Tenth Circuit test only requires that management level employees know of the sexual harass-

ment. *Hirase–Doi,* at 783. Mr. Shine, the de facto chief operating officer, is clearly a management level employee of the defendants and he not only knew of the sexual harassment, he was the perpetrator. That finding is entirely adequate to impute liability for Mr. Shine's conduct to the defendants under *Hirase–Doi*'s second option. *Id.*

The court also found, based on a credibility determination, that Scott Krigel, through Ms. Eichenwald's conversation with his wife, Susan Krigel, was aware of the sexual harassment problems Ms. Eichenwald had in 1988 while working at Krigel's. Therefore, the court found that Scott Krigel, the President of the defendants, had actual knowledge of Ms. Eichenwald's sexual harassment problem in 1988 and did nothing about it. Clearly, if he had exercised reasonable care, Mr. Krigel should have known that there was a sexual harassment problem within his company. *Hirase–Doi,* at 783; *Kansas State University,* 780 F.Supp. at 763. He turned his head aside and ignored the problem.

Although the court misheard Ms. Green's testimony with respect to her comments concerning Mr. Shine's power to fire and transfer employees, that does not alter the court's conclusion that Mr. Shine had *apparent* authority to hire and fire Krigel's employees, including the plaintiffs, and that he used his supervisory position to aid his tortious conduct. Mr. Shine, the vice president of operations for the defendants, was second only to the Krigel family members in power. His supervisory position required him to have extensive interaction with Krigel's employees, including the plaintiffs in this case. The court believes that his comments to the plaintiffs like "this is my store" and the fact that the Krigels did nothing to indicate otherwise reinforced and justified the plaintiffs' belief that Mr. Shine had the authority to affect their livelihoods. The court also believes that Mr. Shine was aided in accomplishing his sexual harassment of the plaintiffs by virtue of his high level position with the defendants. The plaintiffs were justifiably afraid to complain about Mr. Shine's conduct based upon his upper level management position with the defendants and his dominating, hostile, and volatile personality. Mr. Shine's

threats, like telling the plaintiffs not to "fuck" with him, kept Ms. Eichenwald, Ms. Fuller, and Ms. Richman in constant fear of him. Based upon the overwhelming evidence, the court concludes that Mr. Shine had apparent authority to fire or transfer the plaintiffs, that he used his supervisory position over the plaintiffs as an aid in the harassment of the plaintiffs, and that the defendants are liable for his sexual harassment of the plaintiffs. Restatement (Second) of Agency § 219(2)(d); *Hirase–Doi,* at 783; *Board of Regents of State of Kansas,* 770 F.Supp. at 1488–89.

The plaintiffs' counsel succinctly addressed the defendants' arguments by noting that "[p]laintiffs cannot conceive of any case wherein the apparent authority of the sexual harasser was so clear or where the employer's liability for a high-level management employee's sexual harassment is so obvious." The evidence and the law overwhelmingly indicate that the conduct of Mr. Shine should be imputed to the defendants and defendants' arguments to the contrary are utterly devoid of merit. Their motion on this ground is denied.

### 2. Ms. Eichenwald's constructive discharge

The defendants raise no new argument or new evidence on this issue and, therefore, lose because they do not meet the standard for a motion to alter or amend. *See Hancock v. City of Oklahoma City,* 857 F.2d 1394, 1395 (10th Cir.1988). The court concluded that Ms. Eichenwald was constructively discharged based upon the law and the evidence presented at trial, and the defendant presents no credible reason why the court should reconsider its position. *See United States v. One Parcel Property,* No. 91–2398–GTV, 1993 WL 289198 at *1 (D.Kan. August 18, 1993). A reasonable person would have perceived the transfer as a retaliatory move consistent with a pervasive pattern of hostile work environment sexual harassment and would, in part on that basis, have found the working conditions intolerable.

### 3. Back pay remedy

The court made a mathematical mistake when it calculated what Ms. Richman's 1995 earnings at Krigel's would have been. The defendants correctly point out that in footnote 101, the court should have multiplied the 4% commission by $33,919.60, not $52,000, because the court calculated Ms. Richman wages only through September of 1995. As a result, Ms. Richman's projected 1995 income at Krigel's would have been $7,986.76, not $8,710. Therefore, Ms. Richman's lost back pay from 1995 is $4,172.10, not $4,895.32, and her net loss is $4,172.10, not $4,895.32.

The defendants also challenge the court's method of calculating the plaintiffs' back pay asserting that the court's method is unreasonable and inconsistent with the purpose of the remedy provisions of Title VII. The defendants would have the court calculate the plaintiffs' back pay by considering the entire time period as a whole instead of the court's yearly basis. Because considerable discretion is vested in the district court when devising remedies for Title VII violations, the court concludes that its back pay determinations are reasonable and that they are consistent with the purposes of the remedy provisions of Title VII. *The Estate of Pitre v. Western Elec. Co.,* 975 F.2d 700 (10th Cir.1992) (citing *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)). Therefore, defendants' motion is denied with respect to their suggestion that the court change its method of calculating the successful plaintiffs' back pay.

### 4. Mitigation of damages

Once the plaintiff has shown a violation of Title VII and back pay has been awarded, "the employer has the burden of showing that the discriminatee did not exercise reasonable diligence in mitigating the damages caused by the employer's illegal actions." *Ramirez v. Bravo's Holding Co.,* No. 94–2396–GTV, 1995 WL 649952 at *4 (D.Kan. Oct. 5, 1995) (citing *United States v. Lee Way Motor Freight, Inc.,* 625 F.2d 918, 937 (10th Cir.1979)). The plaintiff must only make a reasonable, good faith effort to mitigate damages and is not held to the highest

standards of diligence. *Id.* Because the defendants failed in their burden of proof at trial on this point and have shown no basis to reconsider, their motion is denied on this point.

 The defendants assert that Ms. Richman and Ms. Eichenwald's back pay should be reduced because they did not use reasonable diligence to mitigate their damages. The defendants argue that because Ms. Richman turned down a car salesperson position which had the potential to pay her $30,000 and because Ms. Richman took a server position instead of a higher paying position at the Limited Express, Ms. Richman did not use reasonable diligence to mitigate her damages. The court disagrees. Whether Ms. Richman could have made $30,000 selling cars in Topeka is speculative at best because that job's salary was solely on a commission basis. While cars and jewelry are both expensive items, the court understands why Ms. Richman, a person who was living paycheck to paycheck, would turn down a position as a car salesperson because her compensation would be too speculative. Even while working at Krigel's, Ms. Richman knew she would at least make her hourly wage if sales were scarce. According to the evidence, Ms. Richman would not have had an hourly wage if she took the car salesperson position. The court simply was not persuaded that Ms. Richman failed to mitigate.

 The defendants also argue that because Ms. Eichenwald was unemployed for a large portion of 1993, Ms. Eichenwald did not use reasonable diligence to mitigate her damages. The court disagrees. The court believes that Ms. Eichenwald did use reasonable diligence to mitigate her damages. Unlike Ms. Richman's case, the defendants do not point to any specific position Ms. Eichenwald was offered and did not accept during 1993. The court cannot conclude from the record before it that Ms. Eichenwald did not make a good faith effort to mitigate her damages because the defendants did not present any evidence that there were jobs with equivalent duties and pay available. *See Ramirez v. Bravo's Holding Co.,* No. 94–2396–GTV, 1995 WL 649952 at *4 (D.Kan. Oct. 5, 1995).

### C. Standard for a "prevailing party" under Title VII

 The case law has enunciated stringent standards that must be met before a court may award attorney's fees to a prevailing defendant pursuant to 42 U.S.C. § 2000e–5(k).

"In sum, a district court may in its discretion award attorney's fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith. In applying these criteria, it is important that a district court resist the understandable temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation. This kind of hindsight logic could discourage all but the most airtight claims, for seldom can a prospective plaintiff be sure of ultimate success. No matter how honest one's belief that he has been the victim of discrimination, no matter how meritorious one's claim may appear at the outset, the course of litigation is rarely predictable. Decisive facts may not emerge until discovery or trial. The law may change or clarify in the midst of litigation. Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit." *Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 421–22, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978).

### D. Analysis

#### 1. Ms. Gilbert

 While Ms. Gilbert did wait until the morning of the trial to dismiss her claim, the court does not believe her situation meets the *Christiansburg* test. Ms. Gilbert testified that she was subject to a hostile work environment while an employee of the defendants. The court found her testimony credible. Because the *Christiansburg* test does not focus on the timing of a plaintiff's voluntary dismissal of his or her claim with preju-

dice and because the court could not find a case awarding a defendant attorney's fees in a Title VII case when the plaintiff dismissed its claim with prejudice the day of trial, the court finds that Ms. Gilbert's claim was not frivolous, unreasonable, or without foundation and, therefore, the defendants are not entitled to attorney's fees with respect to Ms. Gilbert's claim. *See Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421–22, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978).

### 2. Mr. Harrison

The court believes that Mr. Harrison's claim does meet the *Christiansburg* test and that the defendants should be declared the "prevailing party" with respect to Mr. Harrison's claim for three reasons. First, the court found Mr. Harrison not to be a credible witness. Second, the court concluded that the evidence overwhelmingly indicated that Mr. Harrison had not been subjected to a hostile work environment and that he had not been discriminated against because of his sex. In fact, the court found that Mr. Harrison welcomed the sexually explicit discussions with Mr. Shine. Third, the court concluded that Mr. Harrison was using his lawsuit as a "vehicle to strike back at Krigel's for failing to promote him to store manager." While the course of litigation is rarely predictable, the court believes that Mr. Harrison brought his claim in bad faith. Therefore, the court concludes that Mr. Harrison's claim is so frivolous, unreasonable, and without foundation that the defendants should be awarded reasonable attorney's fees with respect to his claim. *See Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421–22, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978).[1]

### E. Standard for new trial

Motions for a new trial are committed to the sound discretion of the trial court. *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984); *Hinds v. General Motors Corp.*, 988 F.2d 1039, 1046 (10th Cir.1993). In reviewing a motion for new trial the court must view the evidence in the light most favorable to the prevailing party. *Griffin v. Strong*, 983 F.2d 1544, 1546 (10th Cir.1993). Moreover, the court should "exercise judgment in preference to the automatic reversal for 'error' and ignore errors that do not affect the essential fairness of the trial." *McDonough Power Equipment, Inc.*, 464 U.S. at 553, 104 S.Ct. at 848. No error in the admission or exclusion of evidence, and no error in ruling or order of the court or anything done or omitted by the court can be grounds for granting a new trial unless the error or defect affects the substantial rights of the parties. *Rasmussen Drilling, Inc. v. Kerr–McGee Nuclear Corp.*, 571 F.2d 1144, 1148–49 (10th Cir.), *cert. denied*, 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171 (1978); Fed.R.Civ.P. 61.

### F. Analysis

The defendants have not met their burden because they have failed to show that any mistake by the court affected their substantial rights. The two mistakes that the court made concern (1) the mishearing of a minor witness whose testimony is not necessary to prove any element of the plaintiffs' case and (2) a mathematical error in the computation of Ms. Richman's back pay which the court has now corrected. Because motions for a new trial are committed to the sound discretion of the trial court and because the court is directed by the Supreme Court of the United States to ignore errors that do not affect the essential fairness of the trial, the court denies the defendants' motion for a new trial. *See McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 104 S.Ct. 845, 78 L.Ed.2d 663 (1984).

IT IS THEREFORE ORDERED BY THE COURT that defendants' motion to reconsider (Doc. # 85) is granted with respect to the court's mistakes concerning Ms. Green's testimony and the calculation of Ms. Richman's back pay award and denied with respect to the defendants' liability, the defendants' alternative back pay calculation meth-

---

1. The defendants are directed to proceed in accordance with D.Kan.Rule 54.2 (formerly Rule 220) and to bring the fee matter before the court as soon as possible so that it can be resolved in connection with the plaintiffs' now pending fee motion.

od, the defendants' argument that plaintiffs failed to mitigate their damages, and the defendants' argument that Ms. Eichenwald was not constructively discharged. The court's opinion should reflect that Ms. Green did not testify that Mr. Shine had the power to fire or transfer employees and that Ms. Richman is entitled to $4,172.10, not $4,895.32, in the form of back pay.

**IT IS FURTHER ORDERED BY THE COURT** that the defendants are the prevailing party with respect to Mr. Harrison's claim and that the defendants are not the prevailing party with respect to Ms. Gilbert's claim.

**IT IS FURTHER ORDERED BY THE COURT** that defendants' motion for a new trial (Doc. # 85) is denied.

**IT IS SO ORDERED.**